UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - X
LYDIA COTZ,                                :
                                                        05 Civ. 2991 (WCC)
                         Plaintiff,        :

          - against -                      :           **OPINION**
                                                       **AND ORDER**
DEBRA MASTROENI, individually and as       :
CLERK OF THE VILLAGE OF MONTEBELLO;
SANTOS LUCIANNO, individually and as       :
INSPECTOR OF ELECTIONS OF THE VILLAGE
OF MONTEBELLO; VILLAGE OF MONTEBELLO;      :
f/n/u LAMPERT, individually and as
LIEUTENANT OF THE TOWN OF RAMAPO POLICE    :
DEPARTMENT; TOWN OF RAMAPO; and BRADLEY
WEIDEL,                                    :

                         Defendants.       :
- - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                                   LYDIA B. COTZ, ESQ.
                                   **Plaintiff *Pro Se***
                                   49 Mile Road
                                   Suffern, New York 10901

                                   RUTHERFORD & CHRISTIE, L.L.P.
                                   **Attorneys for Defendants**
                                     **Debra Mastroeni, Santos Lucianno**
                                     **and Village of Montebello**
                                   300 East 42nd Street, 18th Fl.
                                   New York, New York 10017

LEWIS R. SILVERMAN, ESQ.
CHRISTOPHER J. MULLANE

          Of Counsel

                                   MICHAEL L. KLEIN
                                   TOWN ATTORNEY
                                   TOWN OF RAMAPO
                                   **Attorneys for Defendants**
                                     **Lieutenant Lampert and The Town**
                                     **of Ramapo**
                                   237 Route 59
                                   Suffern, New York 10901

MICHAEL SPECHT, ESQ.
Deputy Town Attorney
          Of Counsel          **Copies Mailed to Counsel of Record_____**

**A P P E A R A N C E S :**   **(continued)**

                                             BURKE, MIELE & GOLDEN, LLP
                                             **Attorneys for Defendant**
                                               **Bradley Weidel**
                                             100 Washington Avenue
                                             P.O. Box 397
                                             Suffern, New York  10901

PATRICK T. BURKE, ESQ.
MICHAEL K. BURKE, ESQ.

          Of Counsel

**Conner, Sr. D.J.:**

Plaintiff Lydia B. Cotz, proceeding *pro se*, brings this action, pursuant to 42 U.S.C. § 1983 and the New York Human Rights Law, against defendants the Village of Montebello (the "Village"), Debra Mastroeni ("Mastroeni"), Santos Luciano ("Luciano"),[1] the Town of Ramapo ("Ramapo"), Leslie Lampert ("Lampert")[2] and Bradley Weidel ("Weidel")[3] (collectively, "defendants") for violations of her federal and state constitutional rights and Title III of the American with Disabilities Act, 42 U.S.C. § 12182 (the "ADA"), as well as for common law claims of slander and assault. Defendants move for summary judgment on all counts. For the reasons that follow, defendants' motions are granted.

---

[1] Lewis R. Silverman, Esq. represents defendants the Village, Mastroeni and Luciano in this action. (*See* Silverman Not. Mot. Supp. Summ. J. at 1.) The Village is located in the Town of Ramapo in Rockland County, New York and is where plaintiff resides. (*See* Complt. ¶¶ 1, 3.) It is largely rural and, as of 2000, was populated by 3,688 residents. *See* http://en.wikipedia.org/wiki/Montebello,_New_York. The Village of Montebello does not have its own police force and uses the services of the Town of Ramapo Police Department. (*See* Am. Complt. ¶ 1.) Mastroeni is the Village Clerk for the Village and, as such, serves as Election Commissioner over Village elections. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 6, 8).) Luciano was employed by the Village to serve as an Election Inspector at the Village election on March 15, 2005. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. E (Luciano Dep. at 89, 96, 100).)

[2] Michael Specht, Esq. represents Ramapo and Lampert in this action. (*See* Specht Not. Mot. Supp. Summ. J. at 1-2.) Ramapo consists of several villages and is populated by approximately 120,000 residents. (*See* M. Burke Aff., Ex. S (St. Lawrence Dep. at 63-64).) Since 1986, Lampert has been employed by the Ramapo Police Department as a police officer and is currently a Lieutenant with the Department. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. F (Lampert Dep. at 8-9).)

[3] Michael K. Burke, Esq. represents Weidel in this action. (*See* Burke Aff. at 1.) Since 1981, Weidel has been employed by the Ramapo Police Department and has held the rank of Detective Lieutenant since 2004. (*See id.*, Ex. H (Weidel Aff. ¶ 1).)

1

## BACKGROUND

Viewed in the light most favorable to plaintiff,[4] the record reveals the following relevant facts. Plaintiff is an attorney admitted in the State of New Jersey and the United States Court of Appeals for the Third Circuit and has practiced law for more than six years.[5] (Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 12-13, 103).) Plaintiff's Complaint, Amended Complaint[6] and submissions in opposition to defendants' motion for summary judgment, although confusing at times and consisting of well over one thousand pages, appear to allege seven distinct incidents (or series of incidents) from which plaintiff's various causes of action arise. (*See generally* Complt.; Am. Complt; Pl. Aff.)

### I.   The "Late 1993 or 1994" Traffic Stop

The earliest incident of which plaintiff complains occurred in late 1993 or 1994 and involves a traffic stop conducted by Thomas Donnelly ("Donnelly"), a Ramapo police officer. (*See* Pl. Aff.

---

[4] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, No. 04-6282-CV, 2007 WL 29977, at *5 (2d Cir. Jan. 5, 2007) ("'In assessing the record to determine whether there is [a genuine issue of material fact], the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'") (quoting *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)); *Tocker v. Philip Morris Cos., Inc.*, 470 F.3d 481, 486 (2d Cir. 2006) ("We [must] . . . constru[e] the facts in the light most favorable to the non-moving party . . . ."); *Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, No. 03 Civ. 1895, 2007 WL 39301, at *5 (S.D.N.Y. Jan. 8, 2007) ("In determining whether a genuine issue of material fact exists, the Court must examine all evidence in the light most favorable to the nonmoving party.").

[5] Plaintiff also works as an Adjunct Professor of Sociology and Women Studies at Ramapo College of New Jersey. (*See* M. Burke Aff., Ex. F (Pl. Dep. at 11).)

[6] Plaintiff filed a "First Amendment to Complaint" that supplements plaintiff's Complaint, and plaintiff's Complaint and "First Amendment to Complaint" are intended to be read together. (*See generally* Complt.; Am. Complt.)

2

¶ 7; Complt. ¶ 16.)  Plaintiff alleges that Donnelly, while off-duty, pulled her over while she was driving on Route 59 in Tallman, New York after allegedly observing plaintiff illegally cross a double-yellow line.  (*See id.*)  Plaintiff claims that he "forced her into a dark[] parking lot, where he blocked the only exit[,] . . . threatened to arrest [p]laintiff" and ultimately issued her a traffic summons.  (*See id.*)  According to plaintiff, "[w]hen [she] told him [that] she was going to report him to his superiors, he laughed and said 'my father-in-law is the chief . . . . You can't touch me.'" (*See id.*)  Although plaintiff thereafter filed a complaint with the Ramapo Police Department, the Department has no record of her complaint, and the traffic summons was never prosecuted.[7]  (*See* Pl. Aff. ¶ 7.)

## II.    Domestic Visitation Disputes

The next series of incidents of which plaintiff complains dates back to the 1980s extending to 1999, and concerns the involvement of the Ramapo Police Department in the domestic disputes between plaintiff and her former husband regarding his visitation with their sons.  (*See* Complt. ¶¶ 9-15.)  Plaintiff and James Peikon ("Peikon") were divorced in 1987 (*see* Pl. Aff., Ex. 10; Complt. ¶ 9), and the Family Court of the State of New York awarded plaintiff sole custody of the children and awarded Peikon visitation with the child on alternate weekends commencing on January 24, 1998.  (*See* M. Burke Aff., Ex. J; Complt. ¶ 9.)

On several occasions, however, plaintiff refused Peikon visitation with their sons when

---

[7] According to Donnelly, after he issued plaintiff the traffic summons, plaintiff became irate. (*See* Specht Affm., Ex. B (Donnelly Aff. ¶¶ 2-3).)  Although Donnelly does not recall the disposition of the ticket, he never appeared in court regarding this matter.  (*See id.*  (Donnelly Aff. ¶ 4); Pl. Aff., Ex. 5 (Donnelly Dep. at 165-66).)

plaintiff did not believe it was in her sons' best interest. (*See* Pl. Aff. ¶ 11; Complt. ¶¶ 9-15.) On such occasions, Peikon called the Ramapo Police Department to assist him in enforcing the court's visitation order. (*See* M. Burke Aff., Ex. J; Complt. ¶¶ 9-15.) According to plaintiff, in response to Peikon's calls for police assistance, the Ramapo Police Department "took it upon themselves to interpret and try to enforce the [visitation order of the family court] by attempting to intimidate [p]laintiff into surrendering her children using threats of arrest and jail." (*See* Complt. ¶ 9.)

Specifically, in the summer of 1997, plaintiff and Peikon had frequent disagreements as to the particular weekends during which Peikon had visitation. (*See* Pl. Aff. ¶ 8.) On one such occasion, Peikon came to plaintiff's house to pick up their sons, and plaintiff refused to allow her sons to leave the house because she believed that Peikon did not have visitation on that particular weekend. (*See id.*) Peikon called the police for assistance and, according to plaintiff, Donnelly responded and tried to gain entry into plaintiff's home without a warrant or consent. (*See id.*) Although plaintiff claims that she and her current husband, George J. Cotz ("Cotz"), were able to prevent Donnelly from gaining entry, the record does not indicate whether plaintiff ultimately complied with Donnelly's demands or any other fact relating thereto. (*See id.*)

Plaintiff also alleges that, on December 27, 1997, she refused to allow her son to go to a Giants football game with Peikon because the weather was bad and the child was not feeling well.[8] (*See* Complt. ¶ 15.) Peikon called the police for assistance, and Mark A. Emma ("Emma"), a police officer of the Ramapo Police Department, responded. (*See* Pl. Aff. ¶ 9; Complt. ¶ 15.) Plaintiff claims that Emma attempted to gain entry into her home and threatened to arrest plaintiff if she did

---

[8] In her affidavit, however, plaintiff claims that she did want her son to attend the Giants game because Peikon was going to allow their son, who was an adolescent, to attend without adult supervision. (*See* Pl. Aff. ¶ 9; *see also* G. Cotz Aff. ¶ 3.)

4

not allow her son to go with Peikon. (*See* Pl. Aff. ¶ 9; Complt. ¶ 15; G. Cotz Aff. ¶¶ 3-4.) At the time, plaintiff had just finished showering and was wrapped only in a towel, and Emma threatened to "take her to the station 'just as [she] was.'" (*See* Pl. Aff. ¶ 9; Complt. ¶ 15; G. Cotz Aff. ¶¶ 3-4.) In fear of arrest, plaintiff acquiesced and allowed her son to leave with Peikon. (G. Cotz Aff. ¶ 4.)

Approximately seven months later, on July 24, 1998, plaintiff called Peikon and informed him that their son was sick and that Peikon's visitation the next day would be cancelled or at least delayed. (*See* Pl. Aff. ¶ 12; Complt. ¶ 13.) Plaintiff claims that her son had chest pains and that they were waiting to hear back from the child's cardiologist and to receive the results of a chest x-ray. (*See* Pl. Aff. ¶ 12; Complt. ¶ 13; G. Cotz Aff. ¶ 5.) The next day, however, Peikon went to plaintiff's house and plaintiff refused to allow her son to go with him.[9] (*See id.*) Peikon then drove to the Ramapo police station for police assistance, and he returned with Donnelly, Emma and Officer Byrnes.[10] (*See id.*) According to plaintiff, Donnelly "proceeded to ring the door bells, . . . bang on doors, call at windows and kick doors in an effort to get [p]laintiff to speak to him." (*See* Complt. ¶ 13; Pl. Aff. ¶ 12.) Plaintiff claims that when she opened the door to her house, Donnelly put his body in the doorway and entered "her premises . . . and refused to leave." (*See id.*) Plaintiff also claims that the Ramapo Police Department attempted to retrieve the child's medical records from the hospital where he was being treated in an attempt to verify his medical condition.[11] (*See* Pl. Aff.

---

[9] According to the police report, Peikon claimed that plaintiff assaulted his car with a wooden broom handle when he arrived at plaintiff's house. (*See* M. Burke Aff., Ex. J.)

[10] Byrnes's first name is not clearly transcribed on the police record and is not otherwise indicated in the record.

[11] However, according to the police reports and the affidavit of Donnelly, plaintiff refused to answer her door for fifteen minutes despite the officers' repeated command to do so. (*See* M. Burke Aff., Ex. J; Specht Affm., Ex. B (Donnelly Aff. ¶¶ 6-7).) The officers informed her that if she

¶ 12; G. Cotz Aff. ¶ 5.)

Plaintiff alleges that, "[u]pon information and belief, from before 1990 until January 1999, the [Ramapo Police Department] had a policy . . . [or custom] of using the threat of criminal contempt charges, primarily directed at women/mothers, to enforce their interpretation of visitation orders." (*See* Complt. ¶ 11.)  In fact, prior to 1998, the Ramapo Police Department did not have a specific policy regarding its handling of domestic visitation or custodial disputes.  (*See* Specht Affm., Ex. C (Dolan Aff. ¶ 3).)  However, on September 9, 1998, in light of the constant police involvement in plaintiff and Peikon's visitation disputes, the Chief of Police issued a memorandum to the Ramapo Police Department in which he stated that plaintiff and her former husband were improperly using "the police as tools in their matrimonial dispute."  (*See id.* (Dolan Aff. ¶ 6); Pl. Aff., Ex. 44.)  Accordingly, the memorandum instructed officers to refrain from intervening in their visitation disputes "where no crime other than a violation of a visitation order was alleged[,] but

---

did not open the door, they were going to "treat the incident like an intentional violation of a court order."  (*See* M. Burke Affm., Ex. J.)  When she eventually opened the door, she permitted Byrnes to enter, but as Donnelly attempted to enter, she slammed the door in his face.  (*See id.*; Specht Affm., Ex. B (Donnelly Aff. ¶¶ 6-7.)  Plaintiff refused to talk to Donnelly and threatened to sue him and file complaints against him.  (*See* M. Burke Aff., Ex. J.)  Donnelly waited outside and never entered plaintiff's house.  (*See id.*; Specht Affm., Ex. B (Donnelly Aff. ¶¶ 6-7).)  When Byrnes was inside plaintiff's house, plaintiff showed him the child's medical records that indicated that he had received a chest x-ray on that day.  (*See id.*)  Plaintiff then produced a court order stating that plaintiff was entitled to deny Peikon visitation when she believed that the child was ill.  (*See id.*)  Upon reviewing the court order, the officers returned to the police station where Peikon arrived and produced a medical record indicating that the child's x-ray was "negative." (*See id.*)  Byrnes called plaintiff and informed her that he had seen the x-ray results and that they were negative.  (*See id.*)  Nonetheless, plaintiff stated that she was not going to allow her son to leave the house until the child underwent a stress test and she was assured that he was well.  (*See id.*)  Byrnes informed plaintiff that she could be facing criminal contempt charges, and plaintiff became irate and stated that her lawyer, who she indicated was her husband, advised her to hang up the phone, which she then did.  (*See id.*)  Approximately twenty minutes later, plaintiff called the police station to speak with Byrnes.  (*See id.*)  She indicated to him that she distrusted Emma and Donnelly but believed that she could trust him.  (*See id.*)

6

rather[,] take a report and then suggest to the parties that they seek redress from the court that issued the order that was allegedly violated."  (*See* Specht Affm., Ex. C (Dolan Aff. ¶ 3); Pl. Aff., Ex. 44.)

The memorandum stated:

> Based upon a review of the reports submitted by officers who have had to respond to 49 Mile Road with respect to the domestic situation at this location, it has become clear that the department is being used by both parties to leverage their individual positions.
>
> A court order exists which defines child visitation provisions between Cotz and Peikon.  It is usually an allegation of a violation of the agreement which generates police involvement.
>
> Officers responding to a domestic related call involving these persons should refrain from making an arrest based upon an assertion that the visitation order is or was violated.  Further, officers should not pursue or engage in activities to evidence any assertion that a violation occurred.  As an example, do not enter or even ask to enter a premise to verify that a child is sick or not at home.  Each party knows well the stipulations of their court order.  If either alleges a violation, simply take the report along with their statements and refer the complainant to Family Court.  Arrest is only an option if an officer is acting on a lawful warrant.  Even if it is clear that one of the parties is in contempt of a court order, an information should be filed and submitted to the appropriate court.
>
> The "no-arrest" position of the department <u>does not apply</u> if the conduct by either party requires action pursuant to our domestic violence policy, i.e., HADARM offenses.  If it is criminal contempt, it gets paper only.

(*See* Pl. Aff., Ex. 44.)

The Ramapo Police Department expanded this policy on January 27, 1999 to apply to domestic visitation and custody disputes of all complainants.  (*See* Specht Affm., Ex. C (Dolan Aff. ¶ 7); Pl. Aff., Ex. 43.)  The policy, which is still in effect, instructs an officer "not to make an arrest where the only dispute is whether or not a party violated a visitation or custody order, but to refer the parties back to the court issuing the order after taking each side's statements."  (*See id.*)  The policy is designed to avoid excessive entanglement with domestic disputes that a family court can

handle more effectively and to help conserve police resources for other matters.  (*See* Specht Affm.,

Ex. C (Dolan Aff. ¶ 8).)


### III.    2001 Strip Search Incident

The next incident of which plaintiff complains occurred in September 2001, shortly after the

terrorist attacks on September the 11th.  (*See* Complt. ¶ 29.)  Plaintiff and her husband attended a

public hearing at the Ramapo Town Hall regarding a proposal to construct a power plant in the town.

(*See* Pl. Aff. ¶ 37; Complt. ¶ 29.)  The security at the meeting was more rigorous than usual as a

result of the recent terrorist attacks.  (*See id.*)  All attendees, including plaintiff and Cotz, were

required to enter through a metal detector, which was monitored by two Ramapo police officers, one

of which was Officer Kirk Budnick ("Budnick").  (*See id.*)  Plaintiff alleges that when she

approached the metal detector, Budnick threatened to strip search her.[12]  (*See* Specht Affm., Ex. H

(Pl. Dep. at 288); Pl. Aff. ¶ 37.)  Plaintiff immediately called Michael Specht, Ramapo Town

Attorney and counsel of record in the present action, and plaintiff thereafter entered the building

---

[12] Budnick's recollection of this incident is remarkably different.  According to Budnick, when plaintiff approached the metal detector, she stated, "I'm a Civil Rights attorney . . . . [W]hat if I want to bring a gun into the building?"  (*See* Specht Affm., Ex. G (Budnick Dep. at 112).)  After Budnick indicated that civilians were not permitted to carry firearms inside the building, plaintiff stated that she had a pistol permit which she believed allowed her to bring a pistol into the building.  (*See id.*)  Budnick thought that plaintiff was merely being sarcastic, but asked her whether she had a pistol on her person and plaintiff stated that she did not.  (*See id.* (Budnick Dep. at 112-13).)  According to Budnick, however, plaintiff stated that she was going to bring a pistol inside the building the next day.  (*See id.*)  Budnick told her that he would not allow this, and that is when plaintiff stated, "What are you going to do, strip search me?"  (*See id.* (Budnick Dep. at 113).)

without further incident.[13]  (*See* Pl. Rule 56.1 Stmt. ¶ 37; Pl. Aff. ¶ 37; Complt. ¶ 29.)

---

[13] Plaintiff alleges that shortly thereafter in November 2001, she encountered Budnick at a local 7-11 convenience store in Suffern, New York.  (*See* Pl. Aff. ¶ 39; Complt. ¶ 30.)  Plaintiff claims that he told her "that he was a friend of [plaintiff's neighbor] Verboys, . . . and that he had 'looked . . . [her] up' on the Police Department's computer, and shared the information with Verboys." (*See id.*)  In her affidavit, plaintiff states that Budnick admitted at his deposition that he made these statements to her.  (*See* Pl. Aff. ¶ 39.)  Plaintiff cites Budnick's deposition and attaches the following excerpt as an exhibit:

Q.      Did you tell me in the presence of my sister that you looked me up?
A.      Yes, I did.

(*See* Pl. Aff. ¶ 39, Ex. 58 (Budnick Dep. at 202).)  However, the next few questions, which plaintiff conspicuously omits, reveals the following:

Q.      You had looked me up?
A.      No.  You testified I told you I looked you up.  I didn't say that I told you I looked you up. I didn't say I looked you up.
Q.      On the internet?
A.      What d[o] you mean, internet?
Q.      No.  I'll make a representation –
        Mr. Specht:   Objection.
        Mr. Burke:    Objection.
        Mr. Mullane:  Objection.
Q.      – that you told me that you looked me up in the police department, that you used police assets finding out who Lydia Cotz was.  That's what you told me.  At that point, you told me where I lived, that I was an attorney, what kind of law I practiced , where my law practice was, where my license was, all of those things?
A.      No.
. . .
A.      I didn't look you up.  You said I looked you up on the internet.
Q.      No, you told me you used police assets to look me up.
A.      That's what you're saying.  I did not say that.
Q.      That's exactly what I'm saying.
A.      . . . It was not done.
Q.      It can verified?
A.      Absolutely.  I'm not even a NYSPIN operator.  I don't have access to the computer, somebody else would have to do it.
Q.      Well, did you have somebody else do it?
A.      No, I did not.

(*See* Specht Rule 56.1 Stmt., Ex. F (Budnick Dep. at 202-05).)  Plaintiff's statement in her affidavit

9

**IV.**   <u>**Plaintiff's Police Complaints Regarding Her Neighbor**</u>

Next, plaintiff alleges that the Ramapo Police Department failed to properly handle the complaints filed by her and Cotz regarding disputes that they have had with their neighbor, Joseph A. Verboys ("Verboys"). (*See* Complt. ¶¶ 17-28.) Specifically, in November 1998, plaintiff called the Ramapo Police Department for assistance when she and Verboys had a disagreement regarding his right to trim and cut certain trees growing along their common property boundary. (*See id.* ¶ 17; Pl. Aff. ¶ 31.) Police Officer Kevinson[14] and Sergeant Michael Colbath of the Ramapo Police Department responded and, according to plaintiff, instructed Verboys to "ignore" plaintiff's objections. (*See id.*) Plaintiff alleges that although Colbath was not called to respond to the dispute, he responded nonetheless because he is a personal friend of Verboys.[15] (*See* Pl. Aff. ¶ 31, Ex. 48 (Colbath Dep. at 32).)

Plaintiff alleges that subsequently, on October 31, 2000, Verboys "harassed and assaulted" her and her daughter by walking his Rottweiler on a leash near her daughter's school bus stop, which was immediately adjacent to plaintiff's property. (*See* Complt. ¶ 18.) Plaintiff called the Ramapo Police Department, which dispatched Police Officer Robert Collins ("Collins"). (*See id.*) At this time, Collins apparently had a discussion with Verboys regarding plaintiff's allegations. (*See id.* ¶ 20.) The next day, however, Verboys repeated his conduct from the previous day, and plaintiff again called the Ramapo Police Department, which dispatched Collins. (*See id.*) The same day,

_____

is therefore a gross mischaracterization of the deposition testimony.

[14] Kevinson's  first name does not appear in the record.

[15] The record shows that Verboys owned a beach house that Colbath rented from him. (*See* Pl. Aff., Ex. 48 (Colbath Dep. at 32).)

plaintiff and Cotz also went to the Ramapo police station and requested "to have criminal charges filed against [Verboys], or to press charges themselves." (*See id.* ¶ 22.)  Plaintiff alleges that the officers on duty initially refused "to prepare criminal charges" against Verboys, but "[a]fter nearly five hours at the [station]," they finally acquiesced. (*See id.* (emphasis removed).)

On November 2, 2000, Collins was assigned to plaintiff's daughter's bus stop to determine whether Verboys was engaging in harassing or criminal behavior. (*See id.* ¶ 24.)  Although Verboys walked his Rottweiler in direct view of Collins and in the vicinity of plaintiff and her daughter, the Ramapo Police Department found that Verboys's actions were neither harassing nor criminal in any way. (*See id.*; Specht Affm., Ex. D (Collins Dep. at 43-44).)  Plaintiff claims, however, that Verboys was notified that the police were on watch and, as a result, he acted differently on this day than on the previous occasions when plaintiff had called the police. (*See* Complt. ¶ 24.)  Plaintiff alleges:

> Not only did [Verboys] act as though he was he [sic] aware that he was under observation but, upon information and belief, he was told of the observation by his friend, PO Colbath [who] worked the 11:00 [p.m to] 7:00 [a.m.] shift (on the night of November 1-2, 2000), and would have been in the station when Collins was given the observation assignment. []Colbath is a family friend of [Verboys] (their parents are also friends) and []Colbath has, for several years before and including 2000, rented [Verboys's] house at Beach Haven, [New Jersey] in the summer.  Upon information and belief, []Colbath called [Verboys] and alerted him to Collins['s] observation.

(*See id.* ¶¶ 24-25.)

The charges filed against Verboys were ultimately dismissed. (*See id.* ¶ 28.)  Executive Assistant District Attorney Michael Eaton supervised the investigation and after "speaking to [plaintiff] and other witnesses, [he] determined that the acts complained of, if they in fact occurred, were not criminal in nature . . . ." (*See* Specht Affm., Ex. E (Eaton Aff. ¶ 4).)  Following the dismissal of the charges, Verboys filed a civil action for malicious prosecution against the Ramapo

Police Department, plaintiff and Cotz.  (*See* M. Burke Aff., Ex. E; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 161); Specht Affm., Exs. F, H (Pl. Dep. at 273, 276).)  Although Verboys's claim against the Ramapo Police Department was dismissed, a New York state jury awarded him a $20,000 verdict against plaintiff and Cotz, which was subsequently affirmed by the Appellate Division.   (*See id.*)

According to plaintiff, Verboys continued to harass her "[o]ver the course of 2001, 2002 and 2003" and, as a result, she sought an order of protection against Verboys in the Ramapo Justice Court.  (*See* Complt. ¶ 33; Specht Affm., Ex. C (Dolan Aff. ¶ 14).)  After both Ramapo Justices recused themselves, the matter was transferred to Town Justice Joel J. Flick of Clarkstown, New York who issued an order of protection against Verboys.  (*See* Complt. ¶¶ 33, 35; Pl. Aff., Ex. 52.)  Verboys was charged with harassment and he subsequently accepted an Adjournment in Contemplation of Dismissal.  (*See id.*)

Plaintiff claims that thereafter, the Ramapo Police Department "refused to enforce the [o]rder of [p]rotection" in response to several complaints by plaintiff concerning incidents in which Verboys allegedly:  (1) "stopped his car in the street and stared at [p]laintiff . . ."; (2) "passed her at the bus stop[] in a truck[] and yelled 'bitch' at her"; and (3) "pulled a dump truck [onto her street,] cutting off her daughter's school bus, on three successive days."  (*See* Complt. ¶ 34.)  According to the Ramapo Police Department, its officers conducted thorough investigations of plaintiff's complaints and found that staring at plaintiff and calling her a "bitch," while demeaning, were not criminal acts nor violative of the order of protection.  (*See* Specht Affm., Ex. C (Dolan Aff. ¶ 15).)  In addition, with respect to the dump truck incident, the police interviewed plaintiff and at least one of the school bus drivers and reviewed a video tape provided by plaintiff.  (*See id.*)  It determined that "no proof

12

existed that Mr. Verboys committed this act intentionally, let alone in an effort to harass [plaintiff]."
(*See id.*)  According to the Ramapo Police Department, plaintiff was informed at this time that "if
Mr. Verboys committed an actual violation of the order of protection, or any other offense, he would
be arrested and charged, but that [they] felt that the actions she described did not rise to that level."
(*See id.* (Dolan Aff. ¶ 16).)


V.     **Tree Trimming Allegations**

        Plaintiff next complains of incidents of harassment involving the Ramapo Highway
Department and its attempt to trim trees on plaintiff's property that were blocking view of a stop
sign.  (*See* Complt. ¶¶ 36-39; Pl. Aff. ¶¶ 42-43.)  Plaintiff alleges that in August 2001, a highway
department crew "attempted to enter [her] property through a gate on her stone wall, and she asked
them what they were doing on her property."  (*See* Complt. ¶ 36.)  Plaintiff claims that upon her
inquiry, the crew left, "but made some sort of report to the [Ramapo Police Department], who
arrived and questioned [p]laintiff about this 'incident.'"  (*See id.*)  Plaintiff alleges that "[u]pon
information and belief, in similar circumstances, the [Ramapo Highway Department] has simply
called other members of the community to advise them to cut branches down."  (*See id.*)

        Three years later, in August 2004, "a crew from the [Ramapo Highway Department] was
again dispatched to [the same] corner . . . to trim the same trees on [p]laintiff's property that
obstructed the same [stop] sign in 2001."  (*See id.* ¶ 37; Pl. Aff. ¶ 42; Specht Affm., Ex. H (Pl. Dep.
at 300).)  According to plaintiff, the crew again "attempted to enter [p]laintiff's property[] through
the same gate on her stone wall, but she told them not to trespass."  (*See* Complt. ¶ 37; Specht Affm.,
Ex. H (Pl. Dep. at 300).)  Both at her deposition and in her affidavit, she claimed that they then left

13

without incident.[16]  Plaintiff thereafter called the Ramapo Highway Supervisor and the Ramapo

Attorney, Beth Modica ("Modica"), and informed them that she would have her landscaper trim the

trees, which they both indicated was fine.  (*See id.*)  However, plaintiff claims that while she was on

the phone with Modica,

> her home [was] surrounded by [four] [Ramapo Highway Department] trucks, a
> foreman's vehicle, two [Ramapo Police Department] patrol cars, at least ten . . . men
> from [the Ramapo Highway Department] and [two] police officers, including Lt.
> Bakker.  All of the vehicles had flashing lights on, the road was blocked and traffic
> was stopped. [The Ramapo Highway Department] crewmen were festive and
> laughing.

(*See* Complt. ¶ 38; Specht Affm., Ex. H (Pl. Dep. at 300-03).)  Plaintiff approached one of the

officers and said "you guys are just, you guys are going crazy again." (*See* Specht. Affm., Ex. H (Pl.

Dep. at 303).)  One of the officers immediately ordered everyone to leave the area, and both the

Highway Department crew and police officers left.  (*See id.*)

## VI.    **Plaintiff's Removal from the Polling Place and the Alleged Denial of Her Right to Vote**

Plaintiff next alleges that she was unlawfully removed from the polling place during the

March 2005 Village Trustee election at which she was serving as a poll watcher[17] and thereafter

prohibited from voting in that same election.  (*See* Complt. ¶¶ 42-75.)  She claims that she was

removed from the polls in retaliation for her political activity and her previous public criticism of

---

[16] However, in her Complaint, she alleges that "one cursed her and threatened 'we'll be
back!'" (*See* Complt. ¶ 37.)  This fact is not mentioned in either her deposition testimony or her
affidavit.  (*See* Specht Affm., Ex. H (Pl. Dep. at 300-01); Pl. Aff. ¶ 42.)

[17] Each candidate is entitled to designate an individual to serve at the election as a poll
watcher who is responsible for monitoring the election for any "voting irregularities," such as
electioneering.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 20).)  *See also* N.Y.
ELEC. LAW § 8-500.

14

Mastroeni, the Election Commissioner, who directed Ramapo police officers to remove her. (*See* Complt. ¶¶ 43-47; Pl. Aff. ¶¶ 44-46, 50.) Specifically, during the March 2003 Village mayoral election at which plaintiff also served as a poll watcher, plaintiff criticized Mastroeni for allegedly failing to prevent a poll watcher, who was the husband of a mayoral candidate, from electioneering at the polling place. (*See* Complt. ¶ 45; Pl. Aff. ¶ 45; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 20).) Also, at the conclusion of the 2003 election, Mastroeni instructed plaintiff to leave the polling place when the officials began tallying the votes, which plaintiff claims, as a poll watcher, she had the right to participate in or at least observe.[18] (*See* Pl. Aff. ¶ 45.) Furthermore, plaintiff was the campaign manager for the incumbent candidate in the March 2005 election, and she claims that Mastroeni may have aligned herself with the opposing party and was therefore motivated to remove plaintiff, "the incumbent's campaign manager and articulate supporter," from the polls. (*See* Complt. ¶ 43; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 20); Pl. Mem. Opp. Summ. J. at 7.)

As in the 2003 Village election, Mastroeni, as Election Commissioner, had "ultimate authority" over the Village election on March 15, 2005, which was held during the hours of noon

---

[18] Plaintiff also notes that on prior occasions, she has publicly criticized the Village's use of the services of the Ramapo Police Department on the theory that property taxes for Village residents would decrease by more than one million dollars if it were to use the police force of the adjacent village, the Village of Suffern, in lieu of the Ramapo Police Department. (*See* Am. Complt. ¶¶ 1-2, 5.) According to plaintiff, this criticism engendered controversy because the Village's discontinuance of the services of the Ramapo Police Department would cause Ramapo to either (a) impose a significant tax increase on its residents using Ramapo police services or (b) cause a significant cut-back in the Ramapo Police Department budget (possibly resulting in police department layoffs), or (c) some combination thereof. (*See* Pl. Aff. ¶ 47; Am. Complt. ¶ 3.) However, plaintiff fails to explain the connection between her position on this issue and Mastroeni's decision to remove her from the polls. Although this may be related to the Ramapo Police Department's alleged acts of harassment, there is no apparent reason to believe that Mastroeni was motivated in any way by plaintiff's position on this issue.

15

to nine o'clock p.m. at Village Hall. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. G (Kelly Dep. at 60–61); Complt. ¶ 48.) Mastroeni was present throughout the election and was responsible for overseeing the election and maintaining order at the polls.[19] (*See* Silverman Not. Mot. Supp. Summ. J., Ex. G (Kelly Dep. at 60–61); Pl. Aff., Ex. 70 (Mastroeni Dep. at 46).) An exceptionally large number of voters turned out for the election, and voters waited on long lines to cast their ballots. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. I (Borders Dep. at 49); *id.* at Ex. K (Desiderio Dep. at 16); Pl. Aff., Ex. 123 (Berliner Dep. at 9).)

At around 12:15 p.m., plaintiff arrived at Village Hall to begin her shift as a poll watcher. (*See* Complt. ¶ 50; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 28-29).) As required by New York Election Law, Mastroeni requested to inspect plaintiff's poll watcher certificate. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 29).) Plaintiff had left the certificate at home, and Mastroeni instructed her to go home to retrieve it. (*See id.* (Pl. Dep. at 29, 31).)

At approximately 12:30 p.m., plaintiff returned to Village Hall with her certificate and presented it to Mastroeni. (*See id.* (Pl. Dep. at 31-32, 38).) Upon her return, plaintiff searched the room for a location from where she could hear the Election Inspectors call out each voters' name as they signed in to vote. (*See id.* (Pl. Dep. at 41).) Traditionally, poll watchers have a list of all the registered voters and they keep track of those who voted. (*See id.* (Pl. Dep. at 27-28, 52-53); *id.*, Ex. G (Kelly Dep. at 26-27).)

---

[19] Pursuant to New York Election Law, "the village clerk shall be the election officer of the village and shall have the responsibility for the general conduct of all village elections and shall have vested in him all authority . . . which may be reasonable and necessary to provide for the proper and orderly conduct of such elections . . . ." N.Y. ELEC. LAW § 15-125(1). The statute further provides that the local police department must render to the "village clerk all practicable assistance in . . . the maintenance of order . . . on any day or days designated for voter registration and voting." *Id.* at § 15-125(2)©.

The Election Inspectors were stationed at two tables towards the rear of the room, and behind the tables were the voting machines. (*See* Complt. ¶ 53; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 33-34, 45-47).)  Plaintiff decided to stand between these two tables, leaning against the left table, thereby reducing the space between the tables through which the voters must pass to get to the voting machines. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 45-47, 51-52).)  Although there were six tables with seats at which the poll watchers were expected to sit, plaintiff remained standing because (1) she claims that she had difficulty hearing the Election Inspectors call out the voters' names from those seats and (2) she has a back ailment that causes her severe pain when she sits for certain periods of time.[20]  (*See* Complt. ¶ 51; Pl. Aff. ¶ 51; Silverman Not. Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 118-19); M. Burke Aff., Ex. G.)

However, Mastroeni and all four Election Inspectors testified that plaintiff "paraded" around the Election Inspectors which impeded the flow of voters, particularly in light of the heavy voter turnout. (*See* Silverman Not. Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 155-60, 162-63, 165, 206, 219, 288) (testifying that plaintiff "paraded around the back of the inspectors" and walked "around all over the place impeding the route of the voters"); *id.* Ex. E (Luciano Dep. at 104-05, 161-64) (testifying that plaintiff was behind the registration tables and blocking the voting machines); *id.* Ex. K (Desiderio Dep. at 37-38, 42) (testifying that plaintiff attempted to go behind the Election Inspectors table and that she heard plaintiff, among other people, yelling and shouting); *id.* Ex. H (Sorrillo Dep. at 52-53) (testifying that all four of the Election Inspectors at one point told plaintiff

---

[20] Plaintiff has suffered two herniated discs and a compressed fracture in her spine, and the New York State Workers' Compensation Board has determined that she is partially disabled. (*See* Complt. ¶ 51; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 157).)  Plaintiff, however, provides no admissible evidence other than her testimony regarding her disability.

that she could not be behind their table); *id.* Ex. I (Borders Dep. at 52-55, 60) (testifying that the Election Inspectors were frustrated with plaintiff because she was walking around the election area and impeding the flow of voters and the ability of the Inspectors to perform their jobs); *id.* Ex. J (Whalen Dep. at 41-42, 67) (testifying that plaintiff was being disruptive and impeding the movement of the voters).  Mastroeni also testified that plaintiff aggressively spoke to the Election Inspectors when she discovered that they did not have a voters' list that she could use.  (*See id.* Ex. D (Mastroeni Dep. at 165, 206).)

Plaintiff maintains, however, that she simply stood by the Election Inspectors and did not cause any sort of disruption.  (*See* Pl. Aff. ¶ 51; *see generally* Silverman Not. Mot. Supp. Summ J., Ex. C (Pl. Dep. at 38-73.)  Similarly, Robert Berliner, a voter present at the polls, testified that he saw plaintiff at approximately 12:30 p.m. for several minutes just standing by the Election Inspectors and did not see her behaving in a disruptive manner.  (*See* Pl. Aff., Ex. 122 (Berliner Dep. at 8), Ex. 125 (Berliner Dep. at 23).)  However, plaintiff admits that she remained standing and, on one occasion, walked behind the Election Inspectors' table, which was directly in front of the voting machines.  (*See* Pl. Rule 56.1 Stmt. ¶ 16 (in response to the Village of Montebello, Mastroeni and Luciano).)

Mastroeni approached plaintiff and requested that she sit and not remain standing.  (*See* Silverman Not. Mot. Supp. Summ., Ex. C (Pl. Dep. at 47-48).)  Plaintiff refused to comply with Mastroeni's request, insisting that she was not required to sit, and asked Mastroeni why she had to sit when "[Mastroeni herself] was allowed to stand during the election with the deputy clerk."[21]  (*See*

_____

[21] Incidentally, while plaintiff was deposing Mastroeni, she stood next to the witness who was seated and repeatedly stated, "I'm walking around the room now, Ms. Mastroeni.  I'm standing right next to you.  Do you think you have the right to tell me to sit down?"  (*See* Silverman Not. Mot.

18

*id.*; Complt. ¶ 56; M. Burke Aff., Ex. G.)  According to plaintiff, she also explained to Mastroeni

that she had a back ailment that prevented her from siting for long periods of time and that she could

not hear the Election Inspectors when seated.[22]  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl.

Dep. at 47-48); Complt. ¶ 56; Pl. Aff., Ex. 107.)  At some point, Luciano, who was serving as an

Election Inspector, approached plaintiff and stated, "Who do you think you are, you know, . . . if you

were a guy I'd take you outside and beat the crap out of you."  (*See* Complt. ¶ 59; Silverman Not.

Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 56); Pl. Aff., Ex. 102 (Luciano Dep. at 255).)

    Mastroeni claims that, after plaintiff refused to comply with her request, she called the New

York State Board of Elections ("BOE")[23] in Albany, New York and talked to Pat Murray ("Murray"),

_____

Supp. Summ. J., Ex. D (Mastroeni Dep. at 191-95).)  After plaintiff continued this provocative
behavior, defense counsel Silverman stated, "We're out of here.  We're done."  (*See id.* (Mastroeni
Dep. at 194).)  Silverman ultimately decided, however, that everyone should just take a break, but
when the deposition resumed, plaintiff repeated her objectionable behavior throughout the remainder
of Mastroeni's deposition and during those of other witnesses.  (*See id.* (Mastroeni Dep. at 195, 265-
66, 375, 379, 384, 385, 394-95, 396); *id.* Ex. F (Lampert Dep. at 60, 136-38, 143, 179-80); *id.* Ex.
H (Sorrillo Dep. at 58-59); *id.* Ex. I (Borders Dep. at 73-74).)  For example, during Lampert's
deposition, plaintiff repeatedly insulted her by asking her whether she, her attorney or anyone else
thought or said that she sounded like a man.  (*See id.* Ex. F (Lampert Dep. at 60, 121-22).)  Although
the fact that Lampert may have a low-toned voice is arguably relevant to a tangential issue in this
litigation, it is abundantly clear that plaintiff conducted her questioning in an insulting and
confrontational manner with the apparent intent to offend or upset Lampert.  (*See id.* (Lampert Dep.
at 60, 121-22).)  Additionally, the record is replete with examples of misrepresentations of deposition
testimony made by plaintiff during calls to the Court seeking rulings on objections and in her
opposition papers.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. G (Kelly Dep. at 60–61); *id.*
(Borders Dep. at 73-81); *see supra* n.13.)

    [22] Mastroeni denies that plaintiff ever told her that she had a back ailment that made it
difficult for her to sit.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 191,
351).)

    [23] The State Board of Elections was established:
in the Executive Department on June 1, 1974 as a bipartisan agency vested with the
responsibility for administration and enforcement of all laws relating to elections in
New York State. The Board is also responsible for regulating disclosure and

19

an attorney for BOE.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 222-21).)

Mastroeni claims that she described plaintiff's behavior to Murray, and Murray advised Mastroeni

that she had the authority to remove plaintiff from the polling place.  (*See id.* (Mastroeni Dep. at 223-

25).)  However, the phone records of Village Hall show calls to Albany at 12:57 p.m. and 2:21 p.m.,

thus it is unlikely that Mastroeni called Albany before calling the Ramapo Police Department which

responded to the Village prior to the first call to Albany.  (*See* Pl. Aff. ¶¶ 60, 65, Ex. 119a.)

   In any event, Mastroeni approached plaintiff a second time and requested that she sit, but

plaintiff again refused to comply.[24]  (*See id.* (Mastroeni Dep. at 226); *id.* Ex. C (Pl. Dep. at 54).)

Mastroeni then called the Ramapo Police Department for assistance.  (*See id.* Ex. D (Mastroeni Dep.

at 186-87); Complt. ¶ 61.)  The first police officer, Shawn Bakker ("Bakker"), arrived at 12:46 p.m.,

and Mastroeni immediately approached him near the vestibule at the entrance of the polling place.

(*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 67, 77-80); Pl. Aff. ¶ 65.)  As plaintiff

walked over to them, she heard Mastroeni yell that she wanted plaintiff removed from Village Hall.

(*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 72, 76).)  Two additional police

officers arrived shortly after Bakker, including Lampert.  (*See id.* (Pl. Dep. at 77-80, 87); *id.* Ex. D

_____

   limitations of a Fair Campaign Code intended to govern campaign practices. In
   conducting these wide-ranging responsibilities, the Board offers assistance to local
   election boards and investigates complaints of possible statutory violations. In
   addition to the regulatory and enforcement responsibilities the board is charged with
   the preservation of citizen confidence in the democratic process and enhancement in
   voter participation in elections.

*See*
http://www.elections.state.ny.us/portal/page?_pageid=35,1,35_8534:35_8554&_dad=portal&_sc
hema=PORTAL.

   [24] According to Mastroeni, when she told plaintiff to be seated, plaintiff stated, "You can't
tell me what to do, you have no authority and I don't have to listen to you."  (*See* Silverman Not.
Mot. Supp. Summ. J., Ex. D (Mastroeni Dep. at 162).)

(Mastroeni Dep. at 254).)  When Lampert arrived, she and Mastroeni left the election area and went upstairs.[25]  (*See id.*)

    While Mastroeni and Lampert were upstairs, Mastroeni explained to Lampert that plaintiff was being disruptive and impeding the flow of the voters.  (*See id.* Ex. D (Mastroeni Dep. at 255); *id.* Ex. F (Lampert 6/28/06 Dep. at 19).)  Mastroeni also indicated that she had the authority to request that plaintiff be removed from the polling place.  (*See id.* Ex. D (Mastroeni Dep. at 270).)  In the presence of Lampert, Mastroeni called Murray, counsel at the BOE, and requested the specific citation of the statute that provides the Village Clerk with the authority to maintain order and request police assistance in connection therewith.[26]  (*See id.* (Mastroeni Dep. at 256, 261).)  Lampert testified that she also spoke with Murray for several minutes at this time.  (*See id.* Ex. F (Lampert 6/28/06 Dep. at 70).)  Mastroeni then located the statute in her compilation of the New York State Election Law and provided a copy to Lampert.  (*See id.* Ex. D (Mastroeni Dep. at 255-56, 266, 269); *id.* at Ex. F (Lampert 6/28/06 Dep. at 31-32).)

    After about fifteen minutes, Mastroeni and Lampert came back downstairs to the vestibule area where plaintiff was standing, and Lampert directed her to gather her belongings and leave Village Hall.  (*See id.* Ex. C (Pl. Dep. at 88-89).)  Plaintiff asked why she was being removed from the polls and Lampert said, "Miss Mastroeni is in charge of the elections and she's authorized to

---

    [25] When Mastroeni and Lampert went upstairs, plaintiff remained in the vestibule area and called the Ramapo Police Department requesting to speak with a "supervisor."  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 77-80, 82, 87).)  The dispatcher transferred the call to Peter Brower, Captain of the Ramapo Police Department.  (*See id.*)  Plaintiff explained to him that Mastroeni was attempting to remove her from the polling place, and, according to plaintiff, he said that he would talk to Lampert to help resolve the issue.  (*See id.* (Pl. Dep. at 83-86).)

    [26] The phone record confirms that a call was made from Village Hall to Albany at 12:57 p.m. (*See* Pl. Aff., Ex. 119a.)

make the decision to remove you . . . ."  (*See id.* (Pl. Dep. at 89-90).)  Plaintiff then explained to

Lampert that she could not hear the Election Inspectors when seated and that she had a back problem

that prevented her from sitting for periods of time.  (*See id.* Ex. F (Lampert 6/28/06 Dep. at 20-21);

Complt. ¶ 56.)  Plaintiff also repeatedly told Lampert to call Brower, but Lampert ignored plaintiff's

request because she thought it unlikely that the police Captain would ask plaintiff to instruct her to

call him.  (*See* Silverman Not. Mot. Supp. Summ J., Ex. C (Pl. Dep. at 90-91); *id.* Ex. F (Lampert

6/28/06 Dep. at 14-15).)  She testified that "[i]f he wanted me to call him, he would have [had]

somebody call me on the radio."  (*See id.* Ex. F (Lampert 6/28/06 Dep. at 15).)  Plaintiff eventually

gathered her belongings and left Village Hall.[27]  (*See id.* Ex. C (Pl. Dep. at 92-93).

      After plaintiff left Village Hall, she called the BOE and asked to speak with an attorney.  (*See*

*id.* (Pl. Dep. at 97-99, 100).)  The call was directed to Murray, the attorney to whom Mastroeni spoke

previously.   (*See id.* (Pl. Dep. at 102).)   Plaintiff and Murray knew each other from previous

discussions regarding the Village's election procedure.  (*See id.*)  Plaintiff explained to Murray that

she had been removed from the polling place at Village Hall and that she was barred from returning

to vote.  (*See id.* (Pl. Dep. at 101, 106).)  Murray then revealed to plaintiff that Mastroeni had

previously called her to determine whether she had the authority to remove a particular individual

---

[27] Lampert claims that after she returned to the police station, she also called Ann Marie Kelly ("Kelly"), Democratic Election Commissioner of the Rockland Board of Elections, who advised Lampert that Mastroeni had the authority to remove plaintiff from Village Hall and that plaintiff was also guilty of a misdemeanor.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. F (Lampert 6/28/06 Dep. at 62, 67-68).)  As plaintiff notes, however, Sergeant Victor Eichner ("Eichner"), an officer of the Ramapo Police Department, testified  that he called the Rockland Board of Elections at Lampert's request.  (*See* Pl. Aff. ¶ 65, Ex. 143 (Eichner Dep. at 41).  Kelly testified that only one male police officer called her that day regarding the incident at the polls.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. G (Kelly Dep. at 29-30, 38); *see also* Pl. Aff. ¶ 66.)  She testified that she informed the officer that he had the authority to remove plaintiff and she also faxed the statute regarding poll watching to him.  (*See id.* (Kelly Dep. at 34, 37).)

who was being disruptive.  (*See id.*, Ex. C (Pl. Dep. at 101-02).)  Murray indicated to plaintiff that she advised Mastroeni that, as the Election Commissioner, she had the authority to remove anyone who she reasonably believed was disrupting the election.  (*See id.*)  Plaintiff stated to Murray, "[D]id she tell you that it was over her telling me to sit as opposed to stand[?]"   (*See id.* (Pl. Dep. at 102).)  According to plaintiff, Murray was surprised that plaintiff was removed merely because she refused to sit  and suggested that she would attempt to mediate the situation.  (*See id.* (Pl. Dep. at 102, 105).)

Plaintiff then went to the Ramapo Police Department to file a complaint regarding her removal from the polls.  (*See id.* (Pl. Dep. at 105-06).)  Eichner, who was on duty, brought plaintiff to a room where the officers typically take civilian complaints, and plaintiff demanded that she be allowed to write her own report.  (*See id.* (Pl. Dep. at 108-09).)  Although Eichner did not allow plaintiff to write it herself, he transcribed plaintiff's statement.[28]  (*See id.* (Pl. Dep. at 109); M. Burke Aff., Ex. G.)  She informed him that she was removed from the polls and barred from voting in the election.  (*See id.* (Pl. Dep. at 106-07).)  The report states in part:

> When I returned to Mrs. Cotz in the lobby of the police station[,] I asked Mrs. Cotz if she had a chance to vote, she stated no.  When I asked Mrs. Cotz how long was she in the polling location[,] she stated that she did not have to answer that.  I advised her that I would record her accounts of the incident. . . . That Debra Mastroeni violated her civil rights and harassed Mrs. Cotz by saying that she would throw Mrs. Cotz out for standing up, got up in her face screaming and told her to leave the building and not to continue to be a Poll Watcher.  She didn't get a chance to vote.  Debra Mastroeni didn't care.  Mrs. Cotz told Debra Mastroeni that she was going to call the police then Debra Mastroeni called the police. . . . While speaking with Mrs. Cotz[,] she was continually interrupting our conversation by making calls  on her cell phone. She stated that she was going to sue everyone including the police.  At one point while speaking on her cell phone[,] she stated that Leslie Lampert was going to get

---

[28] Plaintiff emphasizes that she was not allowed to write her own complaint, but admits that the Ramapo Police Department is typically "resistant" to allowing anyone, not just plaintiff, to write the report themselves.  (*See* Complt. ¶ 71; Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 109).)

her ass kicked.  From one minute to the next[,] Mrs. Cotz was calm then excited."
(*See* M. Burke Aff., Ex. G.)   After Eichner took plaintiff's statement, she left the station at
approximately 2:30 p.m.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 106-07).)

After leaving the Ramapo Police Department, plaintiff received a phone call from Murray
who indicated that Mastroeni "was not going to allow [her] back in . . . ."  (*See id.* (Pl. Dep. at 114).)
Plaintiff then went to see Warren Berber ("Berber"), the attorney for the Village, who worked with
plaintiff on political campaigns and was apparently friendly with her.  (*See id.* (Pl. Dep. at 113, 117-
18).)  After plaintiff informed him of the situation, of which he already may have had knowledge,
he said that he was going to call Mastroeni.  (*See id.* (Pl. Dep. at 118-20).)  He left the room
apparently to do so, and when he came back, he told plaintiff to "go back and vote."  (*See id.* (Pl.
Dep. at 122).)

After meeting with Berber, and upon advice from her attorney, plaintiff went to the New
York State Police located in Thiells, New York and filed a report regarding her removal from the
polls.  (*See id.* (Pl. Dep. at 126-27,129); Complt. ¶ 72.)  Plaintiff claims that a State Trooper called
the Ramapo Police Department and Village Hall and advised plaintiff to contact "the District
Attorney's Office and file criminal charges."  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl.
Dep. at 130-32).)  In her affidavit, she alleges that they informed her that she could not return to vote,
but this is wholly unsubstantiated.  (*See* Pl. Aff. ¶ 71.)  In addition, she claims in her Complaint that
the Troopers informed her that the Village's "behavior was 'a serious violation of law.'" (*See*
Complt. ¶ 72.)

Thereafter, at 10:00 p.m., plaintiff returned to the Ramapo Police Department with a video
camera and recorded her conversations with the officer on duty.  (*See* M. Burke Aff., Ex. G.)  At this

24

time, the officers allowed plaintiff to file her own written complaint regarding her removal from the polls.  (*See id.*)   Plaintiff then returned home and did not contact anyone else in regard to the incident at Village Hall.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 132-34).)

At the time plaintiff was removed from the polling place, plaintiff had not voted, and although plaintiff alleges that Mastroeni and Lampert informed plaintiff that she could not later return to vote,  (*see* Complt. ¶ 67), her deposition testimony reveals something very different.  She testified:

> A.    Lieutenant Lampert.  She *didn't* tell me – no, I told Lieutenant Lampert I didn't vote yet and she said to me I don't care, get your stuff and get out. . . .
> Q.    Did anyone else tell you [that] you couldn't vote?
> A.    I want to qualify what Lampert said to me because [sic] Lambert *didn't* say to me you cannot vote.  I told her wait a second, I haven't voted yet.  And she said I don't care, get your stuff, get out before I arrest you.
> Q.    Did anyone else tell you to leave before voting?
> A.    Well, Debbie [Mastroeni] told me to leave before voting.
> Q.    Did Debbie tell you that you could not vote?
> A.    She didn't use those words, no, no.
> Q.    Well, did she say anything to you that lead you to believe that she was not going to allow you to vote?
> A.    Yes.
> Q.    Miss Mastroeni?  What did [she] say?
> A.    She didn't say, not to me – I'm sorry, let me amend my answer.  Not to me.  She said something later . . . to somebody else.

(*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 106-07) (emphasis added).)  Then, in remarkable fashion, plaintiff, in her Rule 56.1 Statement and her affidavit, states:

> I didn't raise [the issue of voting] because I was so astounded and upset at the idea that I was being ejected from the polls.  It didn't occur to me that I never voted for my candidates until a few minutes after I was removed, and then I spent the rest of the day and evening trying to obtain authority from Ms. Mastroeni to return.

(*See* Pl. Rule 56.1 Stmt. ¶ 57; Pl. Aff. ¶ 57.)  Her latest version that she never requested to vote prior

to or during her removal is consistent with the testimony of all the other witnesses, including the

Election Inspectors, Lampert and Mastroeni.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. D

(Mastroeni Dep. at 291-303); *see id.* Ex. F (Lampert 6/28/06 Dep. at 48, 78); M. Burke Aff., Ex. I

(Lampert Aff. ¶ 7); Silverman Not. Mot. Supp. Summ. J., Ex. I (Borders Dep. at 112-13); *id.* Ex. J

(Whalen Dep. at 57, 67-68).)

Furthermore, Lampert testified that prior to plaintiff's removal, she and Mastroeni decided

that, in the event that plaintiff were to ask to vote, they would allow her to. (*See* Silverman Not. Mot.

Supp. Summ. J., Ex. F (Lampert 6/28/06 Dep. at 48).)  Lampert also testified that she never told

plaintiff that she could not return to vote. (*See id.* (Lampert 6/28/06 Dep. at 48, 78).)  In addition,

Mastroeni testified that the New York State Police called her and she indicated that plaintiff was

permitted to return to the polls to vote.  (*See id.* Ex. D (Mastroeni Dep. at 296, 364).)  Similarly, she

spoke with Berber who advised plaintiff to "go back and vote."  (*See id.* (Pl. Dep. at 122).)  Kelly

also testified that plaintiff never mentioned that she was prohibited from voting in the election when

they spoke about the incident at the polls.  (*See id.* Ex. G (Kelly Dep. at 62-63).)

Additionally, plaintiff's police complaint, which was transcribed by Eichner immediately

after the incident, states:

> Mrs. Cotz asked me to take her back to the polling location[, and] then said, ["N]o
> I know who I want to take me back, Charlie Hulse. . . . When I told Ms. Cotz that she
> could go back and vote[,] she got up from a chair she was sitting in, stepped towards
> me, pointed her index finger at me and said loudly[,] ["]are you telling me, you['ʼ]re
> telling me I can go back and vote[!] [Y]ou can't tell me anything[,] it's my rights! .
> . . Mrs. Cotz was further advised that I would send two police officers with her, she
> then stated that she only wanted one officer.  When I reminded Mrs. Cotz that she
> was the one that wanted the police escort[,] she stated one of them is probably that
> "[N]azi Lampert" and she didn't need a police escort.  In an effort to avoid any

26

further incidents at the polling location[,] I posted PO Bassett until about 1545 hours.

(*See* M. Burke Aff., Ex. G.)  Ultimately, plaintiff did not return to vote because she claims that she "feared" that she would have been arrested upon her return to the polls.  (*See* Complt. ¶ 68.)  Plaintiff appears to rely solely on Murray's statement that Mastroeni "was not going to allow [her] back in . . . ."  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 114-15).)  Plaintiff testified that when Murray communicated this to plaintiff, she understood that plaintiff had not yet voted.  (*See id.*)

## VII.  **Allegations Regarding Weidel**

The next and last two incidents of which plaintiff complains involves alleged confrontations between plaintiff and Lieutenant Weidel who is a resident of the Village and lives approximately one-quarter of a mile from plaintiff's residence.  (*See* Am. Complt. ¶ 4; M. Burke Aff., Ex. F (Pl. Dep. at 308).)  Specifically, during a 2005 Village election candidates' forum, which took place at the Suffern Library and was opened to the general public, plaintiff made comments critical of the Ramapo Police Department's traffic enforcement in the Village and opined that the Village should contract with the Suffern Police Department in lieu of the Ramapo Police Department.  (*See* M. Burke Aff., Ex. F (Pl. Dep. at 307, 309-11); Am. Complt. ¶ 6.)  Weidel was at the meeting, and plaintiff claims that he immediately rose from his seat, yelled that plaintiff had no basis for her statements and then "stormed out of the meeting."[29]  (*See* M. Burke Aff., Ex. F (Pl. Dep. at 311); *id.*

---

[29] According to Weidel, however, a candidate recognized him to speak on a certain issue and plaintiff interrupted him and prevented him from speaking at which point he left.  (*See* M. Burke Aff. Ex. H (Weidel Aff. ¶ 6).)  Plaintiff provides no evidence that Weidel spoke to any employee or police officer of the Ramapo Police Department regarding this incident and Weidel denies doing so. (*See id.*)

Ex. H (Weidel Aff. ¶ 5); Am. Complt. ¶ 6.)  Plaintiff alleges that "[o]n information and belief, [her]

position on this issue was a factor in the way she was treated by the . . . [Ramapo Police Department]

and Lampert on election day [in] 2005."  (*See* Am. Complt. ¶ 7.)  Plaintiff claims that "[o]n

information and belief, . . . Weidel was on duty on March 15, 2005 and was involved in making the

decision to remove [p]laintiff from the polls and bar her return to vote."  (*See* Am. Complt. ¶ 8; M.

Burke Aff., Ex. F (Pl. Dep. at 314-15).)  When Weidel's defense counsel asked plaintiff at her

deposition for the basis of this belief, she testified:

> A.   Well, I think when I came into the [police department on election day], I
> think I asked if he was there. . . .  Yeah, I think, I think I, I asked Eichner if
> Weidel was there.  Like who was there.  Like which supervisors.  Because I
> wanted to talk to a supervisor.  And Brower had obviously left or something.
> And I said well, who's here, is Weidel here?  And they said yes, but he's
> unavailable . . . .
> Q.   Did you learn from anybody if Lieutenant Weidel had been involved in any decisions
> regarding the March 15th, 2005 election incident?
> A.   I have not learned that yet.

(*See* M. Burke Aff., Ex. F (Pl. Dep. at 315).)

After plaintiff's deposition, Weidel's attorney, Burke, by letter dated May 11, 2006,

requested that plaintiff withdraw the claim against Weidel regarding the election incident.  (*See id.*

Ex. D.)  He wrote:

> Based on your allegations against my client [in your "First Amendment to
> Complaint"], your sworn testimony and a review of the relevant case law pursuant
> to Fed. R. Civ. P. 11[,] it is respectfully requested that you voluntarily withdraw all
> your claims against Bradley Weidel.

(*See id.*)  Plaintiff, however, did not comply with Burke's request.

Plaintiff's last set of allegations concern a confrontation between plaintiff and Weidel on

May 30, 2005.  (*See* Am. Complt. ¶¶ 9-14; M. Burke Aff., Ex. F (Pl. Dep. at 315-16).)  Specifically,

28

plaintiff's dog ran away and she and her husband went looking for it. (*See* Am. Complt. ¶ 9; M.

Burke Aff., Ex. F (Pl. Dep. at 316-17).) They posted lost-dog signs offering a reward at various

locations, including a utility pole that was approximately one hundred feet from Weidel's residence.

(*See id.*) Plaintiff alleges that Weidel was in his driveway at this time and, when he noticed plaintiff,

he "walked into the street at the end of his driveway[] and stared at [p]laintiff in her car, then yelled

at [plaintiff] 'what are you doing.'" (*See* Am. Complt. ¶ 12; M. Burke Aff., Ex. F (Pl. Dep. at 317).)

Plaintiff testified that Weidel was "[j]ust like what are you doing here. What do you think you're

doing, like he had his hands on his hips." (*See* M. Burke Aff., Ex. F (Pl. Dep. at 318).) According

to plaintiff, Weidel was "attempting to intimidate [p]laintiff from her efforts to find her dog . . . ."

(*See* Am. Complt. ¶ 12; M. Burke Aff., Ex. F (Pl. Dep. at 319, 320).) Plaintiff also testified that

Weidel was not in uniform, and never asserted any sort of official authority, threatened her with

arrest, showed a badge or revealed any sort of weapon. (*See* M. Burke Aff., Ex. F (Pl. Dep. at 318-

21).) Plaintiff immediately called the police from her car to "make a report of harassment against

Weidel," and she then left the scene. (*See* M. Burke Aff., Ex. F (Pl. Dep. at 322-23); Am. Complt.

¶ 15.) The entire incident lasted thirty seconds.[30] (*See* M. Burke Aff., Ex. F (Pl. Dep. at 323).)

---

[30] However, Weidel explained:

On May 30th, 2005, I was at my home enjoying the Memorial Day weekend with my wife and children when I observed a vehicle drive past my residence and stop. A man got out of the vehicle and crossed the street walking towards me and my family. It looked like he was doing something on the same side of the street as my residence. At that point the woman who was driving the vehicle screamed at me "What the fuck are you looking at?" My attention had been drawn to the man – and then this woman – because I did not know what they were doing. I thought they might need help. I told the woman in the car, who I then realized was Ms. Cotz, to watch her mouth because she was cursing. My young children were outside. I did not want them exposed to foul language. Ms. Cotz responded by saying "stop harassing me." I did not, at the time, know what the man was doing near the sewer pump station which

According to plaintiff, when she first called the police, the dispatcher "balked" at her request to send an officer to her residence, but after "several phone calls," the dispatcher finally agreed to send someone to take plaintiff's statement. (*See* Am. Complt. ¶¶ 15, 17.) The record contains the transcript of the dispatcher's conversation with plaintiff, and it contains no evidence of flippant behavior on the part of the dispatcher. (*See* M. Burke Aff., Ex. M.) It does, however, contain numerous instances of threatening statements by plaintiff. (*See* M. Burke Aff., Ex. M.) For example, she stated:

> Plaintiff:      I want a car down to my house soon or else I'm coming up there and raising hell because it's going to end because you know I'm suing all of you. . . . And I wouldn't talk too much to me either now because you're going to be deposed also, by the way.  And you know that, don't you. . . . I want a  complaint of harassment right now.  I want a report made on [Weidel].  Listen, I'm not taking any crap from any of you anymore.  The minute one of you looks at me cross-eyed I'm making a complaint because this is going before a Federal judge in a few months from now and I want him to know every single detail.
>
> Dispatcher:   So why don't you come in, why don't you come in to the police station?
>
> Plaintiff:      No because I'm running around now hanging up signs because my dog means everything to me.  So I want your men, one of your men, ah-hah, I'm making a bona fide complaint against one of your men. If you don't send one up you're violating my rights again.

(*See* M. Burke Aff., Ex. M.)  Weidel also called the Ramapo Police Department to report the

---

is next to my property. . . . After Ms. Cotz drove off[,] I went to [the] area where Mr. Cotz had been. I noticed a sign attached to the pole and realized that he probably was hanging a lost dog sign.  When I had originally spoken with Ms. Cotz[,] I was not aware of what Mr. Cotz was doing.  I did not attempt to prevent her or her husband from posting a lost dog sign.  I was not harassing her or her husband.  When I viewed the lost dog sign on the pole I did not remove it.

(*See* M. Burke Aff., Ex. H (Weidel Aff. ¶¶ 10, 12); Specht Affm., Ex. L (Weidel Dep. 239-40).)

incident.  (*See id.* Ex. L.)

Sergeant Reilly and Officer Quinn from the Ramapo Police Department went to Weidel's residence to take his statement and, immediately thereafter, went to plaintiff's residence to take her statement.  (*See id.* Ex. L.)  Plaintiff claims that her constitutional rights were violated because the Ramapo Police Department took Weidel's statement prior to taking plaintiff's, which, according to plaintiff, is a violation of Ramapo Police Department policy.[31]  (*See* Am. Complt. ¶¶ 17-18.)

Plaintiff brings several causes of action against the various defendants arising out of the facts outlined above.  Discovery is now complete, but only after two years of highly contentious litigation inexcusably prolonged by petty bickering between plaintiff and her adversaries.  Defendants have moved for summary judgment on all counts.  Although plaintiff styles her opposition as a cross motion for summary judgment, plaintiff makes no argument and provides no evidence that suggests that a motion for summary judgment in favor of plaintiff is warranted (or even sought).  We have reviewed the entire record, which contains well over a thousand pages of affidavits, documentary evidence and deposition transcripts (largely consisting of arguments between plaintiff and her adversaries).  Accordingly, this Court will now address the substance of defendants' motions for summary judgment.

---

[31] Notably, when the police officers came to plaintiff's residence at plaintiff's request, she had called a news reporter from her cellular telephone which was on speaker-phone mode so that the reporter could hear the exchange between the officers and plaintiff, and she was apparently videotaping the conversation as well.  (*See* M. Burke Aff., Exs. L, P.)  Plaintiff proceeded to aggressively and repeatedly question why the Ramapo Police Department dispatched two officers rather than one.  (*See id.*)  She also threatened to sue them and subject them to depositions, and she repeatedly interrupted them when they were questioning plaintiff's husband.  (*See id.*)  Both officers appear to have acted professionally and, after taking the statements of plaintiff and her husband, they left without incident.  (*See id.*)

## DISCUSSION

### I.  <u>Legal Standard</u>

It is axiomatic that "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Accordingly, under FED. R. CIV. P. 56, a motion for summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a  judgment as a matter of law."  "A fact is considered 'material' for purposes of Rule 56 if it 'might affect the outcome of the suit under the governing law.'"  *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 404 (S.D.N.Y. 2006) (quoting *Anderson*, 477 U.S. at 248).  The burden rests on the movant to demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  At this stage of litigation, the court's role is not to decide issues of material fact, but to discern whether any exist.  *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).  In doing so, the court must resolve all ambiguities and draw all permissible factual inferences against the movant.  *See Anderson*, 477 U.S. at 255.

"'Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor.'"  *Hill v. Rayboy-Brauestein*, No. 02-CV-3770, 2006 WL 3298383, at *5 (S.D.N.Y. Nov. 9,

2006) (quoting *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995)). The nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Bush*, 452 F. Supp. at 405 ("In making its showing that a genuine issue of material fact exists, the nonmoving party may not rely on 'the mere existence of a scintilla of evidence' to support its position, but must instead proffer 'evidence on which the jury could reasonably find for the [plaintiff].'" (quoting *Dawson v. County of Westchester*, 373 F.3d 265, 272 (2d Cir. 2004)). Nonetheless, "summary judgment is appropriate only when application of the law to th[e] . . . facts will reasonably support only one ultimate conclusion." *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 437 (2d Cir. 1999).


II.    **State Law Claims**

As a preliminary matter, defendants argue that plaintiff's claims under state law must be dismissed because she failed to serve a Notice of Claim upon all the municipal defendants as required by New York General Municipal Law § 50-i(1). We agree.

Pursuant to New York law, "[s]ervice of a notice of claim . . . is a condition precedent to a lawsuit against a municipal[ity]." *Davidson v. Bronx Mun. Hosp.*, 64 N.Y.2d 59, 61 (1984); *see also Williams v. Mahoney*, 41 F. App'x 519, 519 (2d Cir. 2002). This doctrine applies with equal force to state law claims against municipal employees, *see* N.Y. GEN. MUN. L. § 50-i(1), as well as to claims under the New York Human Rights Law. *See Santiago v. Newburgh Enlarged City Sch. Dist.*, 434 F. Supp. 2d 193, 196 (S.D.N.Y. 2006) (applying the Notice of Claim requirement to claims pursuant to the New York Human Rights Law); *Falchenberg v. N.Y. City Dep't of Educ.*, 375

33

F. Supp. 2d 344, 350-51 (S.D.N.Y. 2005) (same).  In the present case, it is undisputed that plaintiff has failed to comply with this condition precedent and has made no application to this Court for leave to serve a late Notice of Claim.  (*See* Specht Affm., Ex. K; M. Burke Aff., Ex. C.) Accordingly, plaintiff's state law claims must be dismissed.[32]  However, even if plaintiff's state law claims were to survive, we would decline to exercise supplemental jurisdiction over them because, as set forth below, none of plaintiff's federal claims are sufficient to survive summary judgment. *See* 28 U.S.C. § 1367(c)(3); *Johnson v. Washington Mut. Bank F.A.*, No. 06-2372-cv, 2007 WL 419270, at *2 (2d Cir. Feb. 2, 2007); *Clissuras v. City Univ. of N.Y.*, 90 F. App'x 566, 567-68 (2d Cir. 2004) ("In the absence of any viable federal claims, the district court was well within its discretion in declining to exercise supplemental jurisdiction over plaintiffs' state law causes of action . . . ."); *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 102-03 (2d Cir.1998).

### III.  **Statute of Limitations**

Defendants also argue, and have pled in their Answer, that several of plaintiff's claims pursuant to 42 U.S.C. § 1983 are barred by the applicable three-year statute of limitations which begins to run when plaintiff knew or had reason to know of the harm.  *See Warren v. Altieri*, 59 F.

---

[32] Plaintiff has also failed to make any argument in opposition to defendants' motion for summary judgment with respect to her state law causes of action and has thereby abandoned them. *See Herrmann v. Moore*, 576 F.2d 453, 455 (2d Cir.), *cert. denied*, 439 U.S. 1003 (1978); *Anti-Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y.), *aff'd*, 130 F.3d 1101 (2d Cir. 1997).  Although the Second Circuit, on at least one occasion, has declined to apply the doctrine of abandonment to a *pro se* litigant, *see Dale v. Bartels,* 732 F.2d 278, 284, n.9 (2d Cir. 1984), in the present case, plaintiff is entitled to no such accommodation, as she has practiced law for approximately six years and claims to specialize in civil rights litigation.  *But see Bascom v. Fried*, 116 F. App'x 300, 301 (2d Cir. 2004) (applying the doctrine of abandonment to a *pro se* litigant who failed to raise in his appellate brief an issue that he had raised at the district court level).

App'x 426, 427 (2d. Cir. 2003) ("§ 1983 action[s are] governed by New York's three-year statute of limitations as set out in N.Y. CPLR § 214, the provision applicable to actions for personal injury."); *see also Clissuras*, 90 F. App'x at 567; *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994).   Plaintiff argues, however, that her claims are timely pursuant to the "continuing violation doctrine."   (*See* Pl. Reply Mem. Opp. Summ. J. at 8-10.)   Accordingly, we first address whether plaintiff's claims are timely under the three-year statute of limitations without regard to the continuing violation doctrine, and we will then address whether the doctrine applies to those claims that plaintiff failed to bring within the allotted time.

Plaintiff filed this action on March 18, 2005, and her earliest claim dates back to "late 1993 or 1994" when she was pulled over while driving on New York Route 59 by Donnelly, an officer of the Ramapo Police Department.   *See supra* pp. 2-3.   Since this incident occurred more than eleven years prior to plaintiff's commencement of this action, it is clearly barred by the statute of limitations.   Plaintiff's next claim involves the Ramapo Police Department's policy or custom in handling her domestic visitation disputes with her ex-husband, beginning as far back as the late 1980s.   *See supra* pp. 3-8.   It is undisputed, however, that the Ramapo Police Department implemented a new policy regarding its handling of plaintiff's domestic visitation disputes in 1998, after which plaintiff concedes that no incidents of police misconduct occurred with respect thereto. Furthermore, plaintiff's "youngest child with . . . Peikon turned 18 in 2000, and there were no further opportunities for disputes regarding visitation issues."   (*See* Pl. Rule 56.1 Stmt. ¶ 30.)   Since the latest incident occurred no fewer than five years prior to the commencement of this action, these claims are also barred by the statute of limitations.   Lastly, plaintiff claims that, in September 2001, Budnick threatened to strip search her as she was entering a town building.   *See supra* pp. 8-10.

35

Clearly, this incident occurred more than three years prior to plaintiff's commencement of this litigation so that this claim is also barred by the statute of limitations.

Plaintiff argues, however, that these alleged acts are actionable pursuant to the continuing violation doctrine. She claims: "All of the actions complained of . . . relating to the [Ramapo Police Department] were reflections of a single illegal policy, custom, practice, and usage: to harass, annoy and frustrate Lydia [Cotz]." (*See* Pl. Reply Mem. Opp. Summ. J. at 8.) In particular, plaintiff contends that the following "violations" are part of a continuing pattern of wrongdoing: (1) Donnelly's 1993 traffic stop; (2) the Ramapo Police Department's response to her visitation disputes in the 1980s and Nineties; (3) Budnick's 2001 threat to strip search her; (4) the Ramapo Police Department's failure to respond to her complaints regarding her neighbor in 1997 and then from approximately 2000 to 2003; and (5) Lampert's removal of her from the polling place in 2005. Plaintiff's argument, however, is without merit.

Under the continuing violation doctrine, a timely charge with respect to a constitutional violation in furtherance of an infirm policy renders claims against other unlawful actions "taken pursuant to that policy timely, even if they would be untimely if standing alone." *Conn. Light & Power Co. v. Sec'y of the U.S. Dep't of Labor*, 85 F.3d 89, 96 (2d Cir. 1996); *Cornwell v. Robinson*, 23 F.3d 694, 703-04 (2d Cir. 1994) ("[Under the continuing violation doctrine,] 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" (quoting *Gomes v. Avco Corp.*, 964 F.2d 1330, 1333 (2d Cir. 1992)); *Purdy v. Town of Greenburgh*, 166 F. Supp. 2d 850, 863-64 (S.D.N.Y. 2001) (Conner, J.) Courts in the Second Circuit view continuing violation arguments with disfavor, and the doctrine's applicability outside of the Title VII or discrimination context is uncertain. *See Jackson v. New York*, 381 F. Supp. 2d

36

80, 88 (N.D.N.Y. 2005); *see also Wilkins v. N.Y. City Dep't of Prob.*, No. 98 Civ. 6611, 2001 WL 262601, at *3 (S.D.N.Y. March 15, 2001).

An allegation of several unlawful acts, even similar ones, does not, in and of itself, establish a continuing violation. *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 52 (2d Cir.1993), *cert. denied*, 511 U.S. 1052 (1994). Rather, "[a] continuing violation exists where there is a relationship between a series of discriminatory actions and an invalid, underlying policy." *Conn. Light & Power*, 85 F.3d at 96.  To obtain the benefit of the continuing violation doctrine, a plaintiff must prove: (1) an underlying unconstitutional policy or practice; and (2) an action taken pursuant to that policy during the statutory period preceding filing the complaint.  *Id.*; *Gavigan v. Clarkstown Cent. Sch. Dist.*, 84 F. Supp. 2d 540, 545 (S.D.N.Y. 2000) (Conner, J.).

In the present case, however, plaintiff has established neither.  Rather, she cites varied police activity: (1) occurring over the course of fifteen years; (2) undertaken by several different officers; (3) occurring under the supervision of different town and department administrators; (4) involving vastly different circumstances; and (5) carried out pursuant to distinct policies or customs.  For example, plaintiff contends that the Ramapo Police Department employed a custom of intimidating women into relinquishing their children, which it used against her during her custody disputes with her ex-husband.  Clearly, this bears no relation to Lampert's removal of plaintiff from the polls at the behest of Mastroeni, the Election Commissioner.  Accordingly, plaintiff's claims arising from Donnelly's 1993 traffic stop, the Ramapo Police Department's handling of her visitation disputes with her ex-husband, and Budnick's threat to strip search plaintiff in 2001 are time barred and must

37

be dismissed.[33]  Nevertheless, we will address each claim on the merits as well.  As the following demonstrates, they are utterly without merit.

**IV.   The "Late 1993 or 1994" Traffic Stop**

Plaintiff first alleges that the Ramapo Police Department violated her constitutional rights when Donnelly subjected her to a traffic stop and issued her a traffic summons for crossing over a double-yellow line.   *See supra* pp. 2-3.   Although plaintiff does not specify the specific constitutional guarantee implicated, "[t]he temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person."[34]  *Holeman v. City of New London*, 425 F.3d 184, 189 (2d Cir. 2005) (quoting *Whren*, 517 U.S. at 809-10).  "The Fourth Amendment requires that an officer making such a stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity."  *Holeman*, 425 F.3d at 189-90 (quoting *Whren*, 517 U.S. at 810; *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).  In the present case, plaintiff does not dispute that she in fact crossed over a double-yellow line – a violation that itself justifies the traffic stop. She merely suggests that Donnelly was motivated by personal animus towards her and that her

---

[33] Ironically, plaintiff has highlighted one of the important objectives of statutes of limitations in her attempt to excuse the lack of evidence with respect to her claims against Weidel by stating that she "understandably does not have date specific recollection of events that occurred nearly [twenty] years ago."  (*See* Pl. Reply Mem. Opp. Summ. J. at 6.)

[34] The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  "'An ordinary traffic stop constitutes a limited seizure within the meaning of [this] Amendment[ ].'"  *United States v. Harrell*, 268 F.3d 141, 148 (2d Cir. 2001) (quoting *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (citation and internal quotation marks omitted); *see also Whren v. United States*, 517 U.S. 806, 809-10 (1996).

constitutional rights were therefore violated.  Even if this were true, it is insufficient to give rise to a Fourth Amendment violation.  *See Holeman*, 425 F.3d at 190 ("Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." (quoting *Wren*, 517 U.S. at 813)).

Moreover, plaintiff was not instructed to exit the car or do anything other than stop her vehicle, and there is no indication that the stop lasted more than a few minutes.  *See, e.g.*, *United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992) ("A critical factor in evaluating the intrusiveness of a stop is the length of the detention.").  The fact that Donnelly allegedly "forced her into a dark[] parking lot . . . [and] threatened to arrest [her]" does not transform an otherwise reasonable traffic stop into an unreasonable one.  (Pl. Aff. ¶ 7; Complt. ¶ 16.)  Likewise, Donnelly's alleged statement that any complaint filed against him would be unavailing because of his father-in-law's position as Chief of Police, although inappropriate, does not transform a lawful stop into an unlawful one, nor does it give rise to an independent claim pursuant to § 1983.  *See Lee v. Mackay*, 29 F. App'x 679, 680 (2d Cir. 2002); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (holding that "verbal harrassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.").  Since plaintiff does not allege that Donnelly lacked probable cause and has failed to show any other constitutional impropriety with respect to the stop, any claims arising from this incident must be dismissed.

Even assuming, *arguendo*, that the traffic stop violated plaintiff's Fourth Amendment right to be free from unreasonable seizures, the town cannot be held liable for Donnelly's actions.  *See*

*City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824-25 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.")  Plaintiff cites no unlawful policy or practice nor a deficiency in training with respect to traffic stops or police searches that could serve the basis for municipal liability here.  Accordingly, plaintiff's claims arising from Donnelly's traffic stop must be dismissed.

## V.    <u>Domestic Visitation Disputes</u>

Next, we must determine whether the Ramapo Police Department's policy or practice of using the threat of arrest and criminal contempt charges to enforce its interpretation of visitation orders violated plaintiff's constitutional rights.  *See supra* pp. 3-8.  Although plaintiff does not specify the particular constitutional guarantees that have been infringed, we can only reasonably construe her claim to implicate the Fourth and Fourteenth Amendments to the United States Constitution.  We will first address plaintiff's argument under the Fourth Amendment.

Construing the record in the light most favorable to plaintiff, the record reveals only one incident in which a Ramapo police officer entered or searched her residence without her consent. *See supra* pp. 4-6.  Although it is highly contested, according to plaintiff, on July 28, 1998, after

40

plaintiff refused to allow her son to leave the house to visit with his father because he was allegedly experiencing chest pains, Donnelly forcibly entered her residence without a warrant. *See supra* p. 5. Assuming that Donnelly's warrantless entrance violated plaintiff's Fourth Amendment right to be free from unreasonable searches, which it likely did, *see Kirk v. Louisiana*, 536 U.S. 635, 637-38 (2002) (holding that the Fourth Amendment requires "probable cause plus exigent circumstances in order to make a lawful entry into a home"); *Hurlman v. Rice*, 927 F.2d 74, 79-80 (2d Cir. 1991) (holding that officers were not entitled to enter plaintiff's home to remove her child, when they had probable cause that she was violating a court order, without procuring a warrant and in the absence of exigent circumstances), there is no basis to hold Ramapo liable for his individual actions.

As discussed briefly *supra* p. 40, in *Monell*, "the Supreme Court held that a municipality may be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue." *Jenkins v. City of New York*, No. 06-0182-CV, 2007 WL 415171, at *11 (2d Cir. Feb. 6, 2007). "Municipal liability attaches only where the deprivation was caused by a policy or custom of the municipality or by a municipal official 'responsible for establishing final policy.'" *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 108-09 (2d Cir. 2006) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)). Clearly, a municipal employee's actions in accordance with a constitutionally deficient policy may serve the basis for municipal liability. *See Monell*, 436 U.S. at 694. But in the present case, it is undisputed that prior to 1999, the Ramapo Police Department had no specific policy regarding the handling of domestic visitation disputes. Even if there were a practice in place, as plaintiff alleges, there is no evidence that it was set in motion by an individual with supervisory or policy-making responsibility. *See id.* Nevertheless, under certain circumstances, a municipality may be held liable as a result of its failure to properly train or instruct its employees

41

who consequently engage in unlawful behavior.  *See, e.g.*, *Jenkins*, 2007 WL 415171, at *11.

However, the failure to train or instruct "may serve as the basis for § 1983 liability *only* where the failure . . . amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Jenkins*, 2007 WL 415171, at *11 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (emphasis added)).  "'Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.'" *Id.*  In addressing this issue, the Second Circuit "has identified three requirements before a municipality's failure to train or supervise constitutes deliberate indifference." *Jenkins*, 2007 WL 415171, at *11 (citing *Walker v. City of New York*, 974 F.2d 293, 300 (2d Cir. 1992)).

> "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." *Id.* (citing *Harris*, 489 U.S. at 390 n.10).  "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Id.* at 298.  "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.'" *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (quoting *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004)).

*Jenkins*, 2007 WL 415171, at *11.  Here, the "ultimate injury" is Donnelly's unlawful, warrantless entry into plaintiff's home.  However, the requirement to obtain a warrant prior to a search of a person's home absent exigent circumstances is such a basic tenet of police procedure that the Ramapo Police Department's failure to train or instruct its officers with specific respect to handling visitation disputes did not cause plaintiff's injury.  *See, e.g.*, *Tuttle*, 471 U.S. at 823 ("At the very

least there must be an affirmative link between the policy and the particular constitutional violation alleged.").  Moreover, plaintiff has made no showing that the Ramapo Police Department failed to train or instruct its officers with respect to the rules surrounding search and seizure.[35]  Accordingly, Ramapo is not liable for Donnelly's warrantless entry into plaintiff's home because the Ramapo Police Department's failure to train its officers in handling visitation disputes is not, as a matter of law, so closely related to her injury that it could be regarded as the cause of the constitutional violation.

As noted, the only other constitutional guarantee that may be implicated by the Ramapo police officers' frequent entanglement with plaintiff and her former husband's visitation disputes is the Due Process Clause of the Fourteenth Amendment.  Because the Complaint (or any other submission) does not allege any set of facts indicating a deprivation of procedural due process, it is assumed that the claim is based on plaintiff's substantive due process rights.  The first step in analyzing a substantive due process claim is to identify the particular liberty interest at stake.  *See O'Connor v. Pierson*, 426 F.3d 187, 201 (2d Cir. 2005) ("To determine whether the [defendant] violated [the plaintiff's] constitutional rights . . ., we first identify the right at stake."); *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir. 1995) ("The first step in substantive due process analysis is to identify the constitutional right at stake.").  The gravamen of plaintiff's allegations is

---

[35] Plaintiff also claims that Ramapo police officers contacted the hospital at which plaintiff's son was treated for chest pains to retrieve his medical records, without consent or a warrant, apparently in an attempt to verify whether the child was in fact sick.  *See supra* pp. 5-6.  Although the record contradicts plaintiff's unsubstantiated allegation in this regard, Ramapo is not liable therefor for the same reasons that it is not liable for Donnelly's warrantless entry into plaintiff's home.  To the extent that plaintiff claims that Weidel, a named defendant, was involved in attempting to unlawfully retrieve her son's medical records, she has provided no evidence substantiating this allegation and, in fact, it is contradicted by the record.  *See supra* pp. 5-6, 6 n.11.

that the Ramapo Police Department had a practice and custom of threatening her with arrest and charges of criminal contempt when she prevented her former husband from visiting their son. Although plaintiff emphasizes that she has a constitutionally protected liberty interest in raising her children, this is not in dispute. In the present case, plaintiff's right or lack of right to prevent her children from associating with their biological father has already been adjudicated by the New York State Family Court, which ordered that Peikon be granted visitation every other weekend. We have no authority to review such an order, absent some independent constitutional wrongdoing. Rather, the interest at stake is plaintiff's purported right to deny her ex-husband visitation of their child, sometimes on days on which he is ordinarily entitled to visitation, when she believes it is in the best interests of the child.[36]  Even assuming, *arguendo*, that plaintiff has a constitutionally protected liberty interest in this regard, plaintiff's claim against Ramapo still must fail.

In order for plaintiff to prevail on her substantive due process claim, she must show that the police officers' actions were extremely "egregious" and conscience-shocking. *See O'Connor*, 426 F.3d at 203. As the Second Circuit has explained, "[s]ubstantive due process is an outer limit on the legitimacy of governmental action." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). "Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 833 (1998) ("[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense.") (citation and internal quotation marks omitted)). "[T]he threshold question

---

[36] Plaintiff claims that the Family Court afforded her the right to deny visitation when she believed that the child was ill.  (*See* Pl. Aff. ¶ 11.)  However, the visitation order does not clearly establish such a right.  (*See id.*, Ex. 16.)  In any event, plaintiff claims that she has denied Peikon visitation on various grounds other than her determination that the child was not feeling well.  (*See* Pl. Rule 56.1 Stmt. ¶ 4.)

44

is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847, n.8.

In the present case, construing the record in the light most favorable to plaintiff, Ramapo police officers responded to plaintiff's residence at the request of her former husband and attempted to coerce plaintiff to allow Peikon visitation by threatening her with arrest and the filing of criminal charges against her. Although the officers allegedly yelled at and threatened plaintiff, banged on doors and windows and, on one occasion, forcibly entered her home without consent or a warrant, they never arrested her, physically touched her or coerced her to leave her home. Also, at all times, they were in possession of the court order that granted Peikon visitation rights with his son on alternate weekends. In addition, although Ramapo police officers attempted to coerce plaintiff to allow Peikon visitation on at least four separate occasions, the record reveals that plaintiff submitted to their demands and "surrendered" her child *only once*. (*See* Pl. Aff. ¶¶ 8-9, 12.) Although police entanglement in non-violent domestic visitation disputes might be unwise, as the Ramapo Police Department appears to concede given its current policy, the officers' actions here do not rise to the level of a substantive due process violation. *See Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) ("To establish a substantive due process violation, the [plaintiff] must show that the Town's alleged acts . . . were 'arbitrary,' 'conscience-shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" (citing *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir.1994) (internal quotation marks and citation omitted)). Since plaintiff has produced no evidence that any individual Ramapo police officer violated her substantive due process rights, her claim against Ramapo must fail in the absence of an underlying constitutional violation. *See, e.g.*, *Clubside, Inc. v. Valentin*, 468 F.3d 144, 161 (2d Cir. 2006) ("[I]f a claim fails as to the individual

45

defendants because there was no violation of the plaintiff's constitutional rights, then it necessarily fails as to the municipality as well.").

## VI.    **2001 Strip Search Incident**

Plaintiff next alleges that in September of 2001, Budnick, an officer of the Ramapo Police Department, threatened to subject her to a strip search as she and her husband were walking into a public hearing at the Ramapo Town Hall. *See supra* pp. 8-9.  Accepting plaintiff's allegations as true, as we must, Budnick's comment was clearly inappropriate, but does not rise to the level of a constitutional violation. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Shabazz*, 994 F. Supp. at 474 (holding that "verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983."); *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997) (same).  Plaintiff was neither strip searched nor subjected to any search other than being scanned by a metal detector, as were all of the other attendees of the event.  Also, plaintiff testified that her husband, after realizing that she was no longer at his side, came back and simply pulled her away from the confrontation.[37]  Even assuming,

---

[37] Plaintiff testified:

So he just started telling me that he had to strip-search me and I said, you know, if you put a hand on me I'm going to, I'm going to call the chief. . . . And then my husband realized I wasn't with him at some point and came down the hallway looking for me and saw me being detained by Budnick.  And, you know, came over and said Lid, what's going on, what's going on, what's going on now?  And he started to pull me.  My husband took me by the arm and said let's go.

(*See* Specht Affm., Ex. H (Pl. Dep. at 290).)

46

however, that Budnick violated plaintiff's constitutional rights, plaintiff failed to produce evidence, or even allege that Budnick was acting pursuant to a town policy or custom, or that he was not trained in the rules concerning search and seizure. Furthermore, the Ramapo Police Department's policy regarding strip searches certainly does not permit a strip search or the threat thereof under the circumstances that were present during this incident. (*See* Specht Affm., Ex. C (Dolan Aff. ¶ 17).)

## VII.   **Plaintiff's Police Complaints Regarding Her Neighbor**

Plaintiff next alleges that the Ramapo Police Department violated her constitutional rights in connection with its handling of plaintiff's complaints against her neighbor, Verboys. *See supra* pp. 10-13. Although plaintiff's allegations are not a model of clarity, she first appears to allege that the Ramapo Police Department mishandled its investigation of her complaints against Verboys which ultimately resulted in the dismissal of the criminal charges that were filed against him at plaintiff's behest. However, the record is devoid of admissible evidence substantiating this allegation, or any other constitutional impropriety related thereto. As explained, although the Ramapo Police Department filed criminal charges against Verboys, the supervising Assistant District Attorney assigned to the case found that the charges were meritless and therefore did not oppose their dismissal. Indeed, Verboys subsequently sued plaintiff and her husband, as well as Ramapo, for malicious prosecution, and a jury awarded him a verdict of $20,000 against plaintiff and her husband.

Plaintiff also alleges that the Ramapo Police Department failed to enforce the protective order that was subsequently issued against Verboys. Even if plaintiff provided admissible evidence substantiating this allegation, which she has not, the Fourteenth Amendment does not impose an

47

affirmative obligation upon the police to take action against an alleged perpetrator in response to a civilian report. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989) ("[The Fourteenth Amendment] forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."); *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (explaining that the failure of police officers to act upon reports of violence does not implicate the victim's rights under the Due Process Clause); *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, No. 04 Civ. 3679, 2006 WL 2997296, at *15-16 (S.D.N.Y. Oct. 13, 2006). Furthermore, the record is devoid of any admissible evidence showing that the officers of the Ramapo Police Department explicitly or implicitly sanctioned any sort of criminal conduct carried out by Verboys. *See id.* Indeed, the record contains no evidence that Verboys committed any crime whatever. *See id.* Accordingly, plaintiff's claims relating to her disputes with Verboys must be dismissed.

## VIII.    Tree Trimming Allegations

Similarly, plaintiff's allegations regarding the Ramapo Highway Department's attempt to trim certain trees on plaintiff's property that were obstructing a stop sign do not give rise to any cognizable claims brought pursuant to § 1983. *See supra* pp. 13-15. Plaintiff does not articulate any sort of constitutional violation, and we cannot discern any. Even so, according to plaintiff, the crew members left plaintiff's property immediately upon her request and, aside from the trimming of a "couple" of branches, no property damage was incurred as a result of their intrusion. (*See* Specht Affm., Ex. H (Pl. Dep. at 300-04.) Also, it appears that, at plaintiff's request, the town will

48

henceforward allow plaintiff to have her landscaper trim any trees on her property that need to be trimmed.  (*See id.*; Pl. Rule 56.1 Stmt. ¶ 42.)  Accordingly, any claims arising from the town's presence on plaintiff's property to trim trees that were obstructing a stop sign must be dismissed.

## IX.  <u>Removal from the Polling Place</u>

### A.  <u>Claims Against Mastroeni and the Village</u>

Plaintiff next alleges that she was removed from the polling place during the March 2005 election at which she was serving as a poll watcher and thereafter prohibited from voting in the election.  (*See* Complt. ¶¶ 42-75.)  *See supra* pp. 14-27.  Plaintiff argues that: (1) her removal from the polls violated her First Amendment right to serve as a poll watcher; (2) she was denied the right to vote in the Village election in violation of the First Amendment; and (3) the Village's refusal to allow plaintiff to stand while she served as a poll watcher violated Title III of the ADA.

First, we must determine whether plaintiff's removal from the election polls violated her First Amendment right to serve as a poll watcher.  N.Y. ELEC. LAW § 8-500 provides, in pertinent part:

> At any . . . village election, *any party committee or independent body whose candidates are upon the ballot* . . . may have for each election district three watchers at any one time . . . .  Watchers may be present at the polling place at least fifteen minutes before the unlocking and examinations of any voting machine or ballot box at the opening of the polls, until after the signing of the inspectors' returns and proclamation of the result.

N.Y. ELEC. LAW § 8-500(1), (2) (emphasis added).  Clearly, by its very terms, the statute vests the right to have watchers present at the polls in a political party or organization, *not* an individual poll watcher.  In the present case, the party or body that appointed plaintiff has not sought redress for her removal.

Moreover, plaintiff has cited no authority, and this Court's independent search has discerned none, for the proposition that an individual poll watcher possesses any actionable rights above and beyond those afforded any member of the general public that is present at a polling place.  Although plaintiff certainly has a right """to associate for the advancement of political beliefs,""" *see Lopez Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 183 (2d Cir. 2006) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 787 (1983) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968))), poll watching is not incidental to this right and has no distinct First Amendment protection.  *See Turner v. Cooper*, 583 F. Supp. 1160, 1161-62 (N.D. Ill. 1983) (holding that the act of poll watching is not protected by the First Amendment); *cf. Tiryak v. Jordan*, 472 F. Supp. 822, 824 (E.D. Pa. 1979) (suggesting that poll watchers are not constitutionally guaranteed components of the election process).  It is at least arguable that the State of New York could eliminate the position of poll watcher without offending the First Amendment because it is a mere creature of state statute.  *See id.*; *see also* N.Y. ELEC. LAW § 8-500(1).  Nevertheless, we will assume, for the purpose of discussion, that plaintiff's right to serve as a poll watcher is protected by the First Amendment.[38]

Thus, the issue is whether Mastroeni violated plaintiff's First Amendment right by requiring her to sit while poll watching.  We believe not.  Polling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content.  *See Burson v. Freeman*, 504 U.S. 191, 216 (1992) (Scalia, J., concurring); *Longo v. U.S. Postal Serv.*, 983 F.2d 9, 11-12 (2d Cir. 1992); *United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749 (6th Cir. 2004) ("By opening up portions of school and private property for use

---

[38]*See Broadrick v. Oklahoma*, 413 U.S. 601, 620-21 (1973) (Douglas, J., dissenting) (enumerating a plethora of activities, including poll watching, that are deeply rooted in First Amendment tradition).

as polling places on election day, Ohio has not opened up a nontraditional forum for public discourse."); *Marlin v. Dist. of Columbia Bd. of Elections & Ethics*, 236 F.3d 716, 719 (D.C. Cir. 2001) ("The forum here, the interior of a polling place, is neither a traditional public forum nor a government-designated one.  It is not available for general public discourse of any sort. The only expressive activity involved is each voter's communication of his own elective choice and this has long been carried out privately-by secret ballot in a restricted space.").[39]  In a non-public forum, "the only requirement of [a] regulation is that it be reasonable and not an effort to suppress a speaker because of a disagreement with that person's views."  *Longo*, 983 F.2d at 12; *see also Peck ex rel. v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 627 (2d Cir. 2005) (regulation in non-public fora must only meet a reasonableness standard).

In the present case, Mastroeni's request for plaintiff to sit was certainly reasonable, particularly in light of the large voter turnout and the complaints that she received from the Election Inspectors regarding plaintiff's behavior.  In addition, since plaintiff was not expressing any particular viewpoints at the time that Mastroeni asked her to sit, Mastroeni clearly did not intend to suppress the expression of any of plaintiff's views.  Indeed, the State certainly has the broad authority to regulate the time, place and manner of elections, and New York has chosen to delegate "the responsibility for the general conduct of all village elections" to the Village Clerk.  *See* N.Y.

---

[39] Even if the polling place were a public forum, the Village's requirement that poll watchers sit would survive First Amendment scrutiny because it is a content-netural time, place and manner restriction that serves an important governmental objective, *i.e.*, ensuring order at the polling place, and is narrowly tailored. *See, e.g.*, *Lusk v. Vill. of Cold Spring*, No. 05-4999 CV, 2007 WL 259873, at *11 (2d Cir. Jan. 31, 2007) ("[T]ime, place, and manner restrictions are permitted so long as they [survive intermediate scrutiny, i.e., they] are content neutral, narrowly tailored to serve a significant governmental interest, . . . leave open ample alternatives for communication . . . ." (internal quotation marks omitted; alterations in original)).

ELEC. LAW § 15-124(1); s*ee Lopez Torres*, 462 F.3d at 184 ("[A] state possesses significant power to structure its own elections[, and] as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." (internal quotation marks omitted)).  Thus, on balance, it would be absurd to hold that the Village cannot require that poll watchers sit while in the polling place.

Plaintiff alleges, however, that Mastroeni targeted her because of plaintiff's political affiliation and past statements regarding Mastroeni's performance as Election Commissioner in the 2003 Village election.  In her opposition papers, she argues:

> [I]t is clear that [p]laintiff was clearly associated with one of the two factions vying for political power in the Village of Montebello, going back at least a year before the 2005 election; that there had been prior issues between [p]laintiff and Mastroeni over the conduct of elections, which included claims that Mastroeni had looked the other way at illegal electioneering by the opposition; and *it is certainly possible* that Mastroeni's actions on March 15, 2005 were pretextual, and designed to get the incumbent's campaign manager and very articulate supporter out of the polls.

(*See* Pl. Mem. Opp. Summ. J. at 7 (emphasis added).)  Mere possibilities are not sufficient to defeat a motion for summary judgment, and, in the present case, the record is devoid of any evidence showing that Mastroeni acted with political animus.  Plaintiff does not allege and apparently does not have specific knowledge as to which candidate, if any, Mastroeni supported in the 2005 Village election.  She merely alleges that Mastroeni was "associated with one of the two factions . . . ."  *See, e.g.*, *Zubrow v. Solvay Pharm., Inc.*, No. 06-1107-CV, 2006 WL 3456542, at *1 (2d Cir. Nov. 30, 2006) ("Mere speculation and conjecture, however, are insufficient to avoid the granting of summary judgment.").  There is also no evidence that Mastroeni removed plaintiff in retaliation for plaintiff's criticism of her in 2003, and, in fact, the record suggests that Mastroeni was never even aware of

plaintiff's previous statements in this regard.  (*See* Pl. Aff., Ex. 68 (Mastroeni Dep. at 24-27).)

Accordingly, plaintiff's claims against Mastroeni and the Village regarding plaintiff's removal from

the polls must be dismissed.[40]


### B.    Claim Against Lampert

_____Plaintiff also brings a claim against Lampert for her role in plaintiff's removal from the polls.

However, the record demonstrates that Lampert clearly had probable cause to remove plaintiff.

---

[40] Assuming that plaintiff alleged a selective enforcement claim in that she was told to sit only because of her political affiliation or past criticism of Mastroeni, plaintiff must "demonstrate that (1) [she was] selectively treated compared with others similarly situated, and (2) such selective treatment was based on impermissible considerations, such as race or religion, or the intent to inhibit the exercise of constitutional rights, or a malicious or bad faith intent to injure a person." *Bey v. City of New York*, No. 05-5262-CV, 2006 WL 3858644, at *1 (2d Cir. Dec. 19, 2006); *see also Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001); *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). "'[A] showing that the plaintiff was treated differently compared to others similarly situated' is a 'prerequisite' and a 'threshold matter' to a selective enforcement claim." *Bey*, 2006 WL 3858644, at *1 (quoting *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004)). "'Whether two employees are similarly situated ordinarily presents a question of fact for the jury.'" *Id.* (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  However, in the present case, plaintiff does not provide any evidence that other poll watchers (or other similarly situated individuals) were standing at the March 2005 election and were not told to sit.  Accordingly, to the extent that plaintiff has brought a selective enforcement claim, it must be dismissed.

If, on the other hand, plaintiff is asserting a claim for First Amendment retaliation, plaintiff must demonstrate that: (1) her speech was constitutionally protected; and (2) a causal connection exists between the protected speech and the adverse action. *See Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004); *McGuire v. Warren*, 404 F. Supp. 2d 530, 536 (S.D.N.Y. 2005) (Conner, J.).  In the present case, however, plaintiff cannot establish a causal connection between her protected speech and her removal from the polls.  There is absolutely no evidence in the record that Mastroeni acted with retaliatory animus.  As noted, with regard to plaintiff's political affiliation, plaintiff merely alleges that it is "possible that" Mastroeni was supporting the opponent of plaintiff's candidate in the 2005 Village election and therefore she may have wanted plaintiff to be removed. With respect to plaintiff's past criticism of Mastroeni, plaintiff made such statements two years earlier, and the record suggests that Mastroeni was not even aware that plaintiff made the statements.

"Probable cause exists when an officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" *Curley v. Village of Suffern*, 268 F.3d 65, 60-70 (2d Cir. 2001) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)).  In sum, Lampert relied on reports of plaintiff's disruption of the election process by two eyewitnesses, one of whom correctly claimed to have ultimate authority in ensuring order at the polls. Specifically, Lampert was first informed by Mastroeni that (i) plaintiff refused to sit at her request, (ii) was being disruptive and (iii) was impeding the flow of voters.  Second, Lampert interviewed Luciano who confirmed Mastroeni's version of the events.  Third, Mastroeni presented to Lampert the statute pursuant to which Mastroeni has "all authority" to maintain order at the polls and request police assistance therewith. Fourth, Lampert talked to Murray of the BOE who confirmed that Mastroeni had the authority to have plaintiff removed from the polls.  Thereafter, Lampert instructed plaintiff to leave the polls or face arrest.  *See Blackmon v. Carroll County Sheriff's Dep't*, No. Civ.A. 3:05CV91LN, 2006 WL 286783, at *3 (S.D. Miss. Feb. 3, 2006) (finding that a police officer was entitled to qualified immunity when he removed and arrested poll watchers after receiving complaints from the poll manager that they were being disruptive and loud, and observed one of the poll watchers arguing with the poll manager).  Even if Mastroeni and Luciano were misrepresenting what they had observed, Lampert had no reason to disbelieve either one of them.  *See Curley*, 268 F.3d at 70 ("When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity, *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)." (internal citation omitted)).  Under these circumstances, Lampert clearly had probable cause to believe that plaintiff was being disruptive and to remove plaintiff from

54

the polls.  To the extent that plaintiff alleges that Lampert may have been motivated by political or personal animus – an unsupported speculation – it is inconsequential.  (*See* Pl. Mem. Opp. Summ. J. at 6.)  *See Holeman*, 425 F.3d at 190 ("[T]he 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." (quoting *Whren*, 517 U.S. at 813)).  Accordingly, plaintiff's claim against Lampert must be dismissed.[41]

## C.    ADA Claim Against the Village

Plaintiff also brings a claim pursuant to Title III of the ADA which forbids discrimination "on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of pubic accommodation." 42 U.S.C. § 12182. "Title III provides private parties with the right to injunctive relief to stop or prevent disability discrimination in a place of public accommodation, but it provides no right to monetary damages for past discrimination." *Bernas v. Cablevision Sys. Corp.*, No. 06-0250-CV, 2007 WL 397395, at *2

---

[41] At a minimum, Lampert is entitled to qualified immunity.  "Under federal law, a police officer is entitled to qualified immunity where "it was 'objectively reasonable' for h[er] to believe that h[er] actions were lawful at the time of the challenged act." *Jenkins*, 2007 WL 415171, at *5 (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir.2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982), and citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). "An officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of arrest-that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.'" *Jenkins*, 2007 WL 415171, at *5 (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)) (citing *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)). "'Arguable' probable cause should not be misunderstood to mean 'almost' probable cause." *Jenkins*, 2007 WL 415171, at *5. "The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed." *Id.* As discussed, Lampert relied on information provided by two eye-witnesses, one of whom correctly claimed to have ultimate authority over the polling place. Thus, she at least had arguable probable cause to remove plaintiff from the polls. Accordingly, even if this Court were to conclude that Lampert lacked probable cause, she would be entitled to qualified immunity.

(2d Cir. Jan. 30, 2007) (citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 86 (2d Cir. 2004)). In order to establish a *prima facie* case under Title III, plaintiff must demonstrate: (1) that she is a "qualified individual" with a disability; (2) that defendants are a public accommodation as defined under Title III; and (3) that she was denied the opportunity to participate in or benefit from defendants' services, programs or activities, or was otherwise discriminated against by defendants on the basis of her disability.  *See, e.g.*, *Powell*, 364 F.3d at 85.

It is axiomatic, however, that not every medical ailment is a "disability" within the meaning of the ADA.  *See, e.g.*, *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).  "The ADA defines 'disability' as 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual.'"[42] *Cooney v. Consol. Edison*, 63 F. App'x 579, 580 (2d Cir. 2003) (quoting 42 U.S.C. § 12102(2)).  Thus, plaintiff must establish that: (1) she has a physical or mental impairment; (2) the physical or mental impairment limits a major life activity; and (3) the limitation of that major life activity is substantial.  *See Capobianco*, 422 F.3d at 56.  Physical impairment is defined as a "'physiological disorder, or condition' that affects one of the major 'body systems,' which include" the musculoskeletal system.  *See Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001) (quoting 29 C.F.R. § 1630.2(h)(1)).  Here, plaintiff testified, and defendants do not dispute, that she has two herniated discs and a compression fracture in her spine – clearly establishing that she has a physical impairment.

Next, we must determine whether plaintiff's impairment limits a "major life activity."  *See* 29 C.F.R. § 1630.2(I); *see also Capobianco*, 422 F.3d at 56.  Here, plaintiff claims that her back

---

[42] The "definition of 'disability' applies to all of the ADA." *Felix v. N.Y. City Transit Auth.*, 324 F.3d 102, 105-06 (2d Cir. 2003) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 201 (2002)).

injuries affect her ability to sit – an activity that has been recognized by the Second Circuit as a "major life activity." *See Ryan v. Grae & Rybicki P.C.*, 135 F.3d 867, 870 (2d Cir. 1998) ("major life activities include . . . sitting") (internal quotation marks omitted); *E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98 Civ. 2270, 2002 WL 31011859, at *13 (S.D.N.Y. Sept. 9, 2002); *Burgos v. City of Rochester*, No. 99-CV-6480, 2003 WL 22956907, at *3 (W.D.N.Y. Mar. 31, 2003).

Lastly, we must determine whether plaintiff's back injuries cause a *substantial impairment* on her ability to sit. To be substantial, the impairment must prevent her from performing "a major life activity that the average person in the general population can perform[.]" 29 C.F.R. § 1630.2(j)(1); *see also Capobianco*, 422 F.3d at 57. Alternatively, the major life activity must be "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." *See id.*; *see also Giordano*, 274 F.3d at 747-48. "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco*, 422 F.3d at 57; *see also Williams*, 534 U.S. at 197 ("The word 'substantial' . . . clearly precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities."). "Moreover the mere fact that an impairment requires an individual to perform a task differently from the average person does not mean that she is disabled within the meaning of the ADA; rather, there must be a significant restriction." *Capobianco*, 422 F.3d at 57. "The inquiry is not just on the effect an impairment has on tasks associated with a specific job, but it must focus primarily on whether the claimant is 'unable to perform the variety of tasks central to most people's

57

daily lives.'"  *Id.* (quoting *Williams*, 534 U.S. at 200).  "Finally, we must consider the effect of the

measures that the individual employs to mitigate or correct the impairment."  *Id.*  (citing *Albertson's,*

*Inc. v. Kirkingburg*, 527 U.S. 555, 565-66 (1999) (emphasizing "that mitigating measures must be

taken into account in judging whether an individual possesses a disability.")); *see also Muller v.*

*Costello*, 187 F.3d 298, 312 (2d Cir. 1999) (noting that an alleged disability must be examined "with

reference to measures that mitigate the individual's impairment") (quoting *Sutton v. United Air*

*Lines, Inc.*, 527 U.S. 471, 475 (1999)).

       In the present case, however, plaintiff provides absolutely no evidence as to the nature and

extent of her impairment of her ability to sit.  The only evidence whatsoever regarding her alleged

disability consists of unsubstantiated allegations.  In her Complaint, she alleges that she "has a

disability, to wit, she has suffered several traumas to her spine including two herniated discs and a

compressed [sic] fracture, which have left her with physical limitations, including a difficulty in

sitting."  (*See* Complt. ¶ 51.)  In addition, at her deposition, she testified that she was found to be

"permanently partially disabled" by the New York State Workers' Compensation Board and that she

had two herniated discs.  (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C. (Pl. Dep. at 157).)

Indeed, plaintiff submits no medical evidence to substantiate or further elaborate her allegations.

This is clearly insufficient to sustain her burden at the summary judgment stage.  *See Douglas v.*

*Victor Capital Group*, 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998) (dismissing the plaintiff's ADA

claim because his "testimony as to the (alleged) limits on his ability to walk, without supporting

medical testimony, simply [was] not sufficient to establish his prima facie case under the ADA.")

(citing *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (dismissing the plaintiff's

ADA claim because she failed to submit medical evidence to substantiate her assertions regarding

the extent of the alleged disability's impairment)).

Even if medical evidence were unnecessary to defeat a motion for summary judgment on an ADA claim, which it is not, plaintiff's own allegations do not provide sufficient information to defeat defendants' motion for summary judgment.  *See, e.g.*, *Yellow Freight Sys.*, 2002 WL 31011859, at *13-17 (considering the duration of time that plaintiff could sit, the amount of pain that the plaintiff experienced when seated and the effect of corrective measures employed by the plaintiff).  The record contains no detailed evidence of the effect of plaintiff's injuries on her daily life, thus warranting dismissal of her claim.  *See Cooney*, 63 F. App'x at 580 (dismissing ADA claim when the plaintiff failed to address how the alleged disability impaired any major life activities); *Burgos*, 2003 WL 22956907, at *3 (dismissing ADA claim when the plaintiff offered conclusory allegations regarding the extent of the impairment of his major life activities and provided no medical evidence aside from doctors' letters which were inadmissible hearsay).  Furthermore, although the record indicates (albeit tangentially) that plaintiff at times wears a back brace, (*see* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 42-43)), plaintiff provides no further evidence relating thereto, which is essential to our analysis.  *See Capobianco*, 422 F.3d at 59 (noting that the ability to correct the impairment is relevant to the court's determination).  The most detailed allegation of the extent of her impairment is that plaintiff finds "sitting uncomfortable and tiresome[,]" and that she "cannot comfortably sit for long periods."  (*See* Pl. Rule 56.1 Stmt. ¶ 37 (in response to Ramapo and Lampert), ¶ 20 (in response to Village, Mastroeni and Luciano); Pl. Aff. ¶ 51.)  This is clearly insufficient.  *See, e.g.*, *Yellow Freight Sys.*, 2002 WL 31011859, at *13 (analyzing a multitude of ADA cases involving back injuries and the ability to sit and noting that "courts have generally found that the inability to sit for periods of an hour or less may constitute a

substantial limitation on the ability to sit, while the ability to sit for periods longer than an hour does not.") Since plaintiff bears the initial burden of establishing a *prima facie* case, her failure to provide sufficient evidence relating to her alleged disability's impairment on her ability to sit is fatal to her ADA claim. *See Ryan*, 135 F.3d at 869.

Even assuming, *arguendo*, that plaintiff has a qualified disability, there is no evidence in the record that she was discriminated against or excluded from the polling place on that basis. The first time Mastroeni requested plaintiff to sit, plaintiff told her that she had a "bad back" and that she "[didn't] think [she] ha[d] to sit down." (*See* Silverman Not. Mot. Supp. Summ. J., Ex. C (Pl. Dep. at 47-48.) The second time Mastroeni requested plaintiff to sit, plaintiff did not even mention her back problem. (*See id.* (Pl. Dep. at 54.) Plaintiff also questioned Mastroeni as to why she had to sit when Mastroeni and another individual were allowed to stand, and, finally, plaintiff told Mastroeni that she would not sit because she would then be unable to hear the Election Inspectors. (*See* Complt. ¶¶ 55-56; Pl. Aff. ¶ 51.) This mixed message, which never clearly informed Mastroeni that plaintiff even had a disability nor requested any sort of accommodation, is insufficient to place the Village on notice regarding plaintiff's disability. Accordingly, plaintiff's ADA claim must be dismissed.

## X. Denial of Right to Vote

Plaintiff also claims that she was denied the right to vote in the Village election in violation of the First Amendment. "The right to vote is regarded as 'a fundamental political right, . . . preservative of all rights.'" *Shannon v. Jacobowitz*, 394 F.3d 90 (2d Cir. 2005) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)). In the present case, however, plaintiff's claim that she was

60

prohibited from voting is utterly unsubstantiated, and even contradicted, by the record.  It is without doubt that when plaintiff arrived at the polling place, she could have voted, and even after she was removed, she could have returned to the polls to vote.  The record unequivocally establishes that: (1) plaintiff was never told by anyone in authority that she was not allowed to vote; (2) plaintiff made no attempt to vote at any time (before, during or after her removal from the polls); (3) Berber, after talking to Mastroeni, informed plaintiff that she could go back to the polls to vote; and (4) the Ramapo Police Department, after plaintiff was removed from the polls, offered her a police escort to the polling place to assure that her right to vote would not be infringed.  Plaintiff claims that she did not return to vote because she feared that she would be arrested.  This conclusory allegation is insufficient to create a genuine issue of material fact to defeat defendants' motions for summary judgment.  *See Budde v. H & K Distrib. Co.*, 216 F.3d 1071, 1071 (2d Cir. 2000) ("Mere . . . unsubstantiated allegations by the opposing party are insufficient to defeat a motion for summary judgment.").  Accordingly, plaintiff's claim arising from her alleged denial of the right to vote must be dismissed.

## XI.    Allegations Regarding Weidel

Lastly, plaintiff brings two causes of action against Weidel.  The first one alleges that Weidel played a part in the decision to remove plaintiff from the polls.  Of course, to sustain her § 1983 claim, plaintiff must present some evidence that Weidel was personally involved in this decision. *See Brown v. City of Syracuse*, 197 F. App'x 22, 25 (2d Cir. 2006) (requiring that the plaintiff show that the individual defendant was personally involved); *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) ("It is well settled in this Circuit that personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983." (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citation and internal quotation marks omitted)); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986) (Because "personal involvement is a question of fact[,] we are governed by the general rule that summary judgment may be granted only if no issues of material fact exist and the defendant[ ] is entitled to judgment as a matter of law.").   In the present case, however, plaintiff testified at her deposition that she has no evidence that Weidel had anything to do with this decision, and she has offered no evidence since then.  *See supra* pp. 28-29.  She merely suspects his involvement.  *See Palomo v. Trs. of Columbia Univ. in City of N.Y.*, 170 F. App'x 194, 197 (2d Cir. 2006) ("mere speculation . . . cannot defeat the defendants' . . . motion for summary judgment."); *Argus Inc. & Interphoto Corp. v. Eastman Kodak Co.*, 801 F.2d 38, 42 (2d Cir.1986) ("[M]ere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion.") (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Accordingly, this claim against Weidel must be dismissed.

Plaintiff's second cause of action against Weidel alleges that he violated her federal constitutional rights by yelling at her when plaintiff and her husband hung her lost-dog flyer on a utility pole near Weidel's residence, and that he thereby discouraged her from exercising her First Amendment rights.  Plaintiff's very allegation, to make no mention of its legal ramifications, is ludicrous.  First, it is undisputed that plaintiff and her husband in fact hung their lost-dog flyer and that Weidel did not remove it.  Thus, she has suffered no harm of the sort cognizable under § 1983.  Even if Weidel's interference had dissuaded plaintiff and Cotz from hanging the sign, "[m]ere rudeness or inconvenience, however unpleasant, does not rise to the level of a cognizable 'chill' on the exercise of First Amendment rights." *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983).

"The Constitution does not prohibit trifling interferences with personal sensibilities." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.), *cert. denied*, 414 U.S. 1033 (1973).

Moreover, even if plaintiff had a First Amendment right to hang a sign on the utility pole and this right was infringed by Weidel's actions, which is clearly not the case,[43] Weidel was not acting under color of law because he was not functioning in his role as a police officer at the time of the confrontation. In determining whether a police officer is acting under color of law, courts look at a variety of factors, including, *inter alia*, whether the officer: (1) was off-duty; (2) identified himself as an officer of the law; (3) was in uniform; (4) was authorized to make an arrest at the time; (5) was carrying handcuffs; (6) was carrying any weapons; (7) flashed a police badge; and (8) placed the plaintiff under arrest or otherwise detained her. *See Rivera v. La Porte*, 896 F.2d 691, 695-96 (2d Cir. 1990); *compare Rivera*, 896 F.2d at 695-96 (concluding that an off-duty corrections officer who arrested the plaintiff was acting under color of law in light of his status as a peace officer, arrest of the plaintiff, use of handcuffs, possession of revolver, use of a police car, and presence with the plaintiff in the police precinct, hospital and central booking) *with United States v. Abney*, No. 03 CR, 60, 2003 WL 22047842, at *3-5 (S.D.N.Y. Aug. 29, 2003) (finding that an off-duty police officer acting as a private security guard at an Old Navy store was not acting under color of law when he questioned a patron suspected of using counterfeit money, identified himself as a security guard but, when later asked by the suspect, informed the suspect that he was an off-duty police officer, never

---

[43] A Village ordinance prohibits the affixing of any material to utility poles. (*See* M. Burke Aff., Ex. O.) It is axiomatic that such ordinances are constitutional restrictions on First Amendment activity. *See Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 807, 814-15 (1984) (holding that a Los Angeles anti-posting ordinance prohibiting a city council candidate from posting signs on utility poles was constitutional); *Herschaft v. Bloomberg*, 70 F. App'x 26, 27-28 (2d Cir. 2003) ("[T]he City has a significant interest in its appearance and in preventing litter which can be created by signs of any size.").

attempted to arrest or detain the plaintiff, and did not use or display his weapon).  Construing the record in the light most favorable to plaintiff, every relevant fact militates in favor of finding that Weidel was not acting under color of law.  He was off-duty, not in uniform, did not identify himself as a police officer, did not show a badge, possessed no weapons or handcuffs, did not threaten or attempt to arrest plaintiff, and was playing with his children in front of his home.  The fact that plaintiff knows that he is a Ramapo police officer and that he may have had an unmarked patrol car in his driveway in no way transforms his private dealings at his home into state action.  Accordingly, plaintiff's § 1983 claim against Weidel must be dismissed.

In any event, even if he were acting under color of state law and, in fact, screamed at plaintiff, this does not rise to the level of a constitutional violation.  The law is clear that verbal harassment or even threats alone are not actionable under 42 U.S.C. § 1983.  In *Hendricks v. Boltja*, for example, a correctional officer allegedly harassed an inmate on multiple occasions by, *inter alia*, seizing his legal documents and destroying them, directing racial epithets at him and telling him "to get [his] black ass out of the library."  20 F. App'x 34, 36 (2d Cir. 2001).  The district court dismissed the action, and the Second Circuit held that "[t]he district court . . . correctly held that verbal harassment was not actionable." *Id.* at 37; *see also Lee*, 29 F. App'x at 680 (holding that the defendant's racial remarks towards the plaintiff did not state a claim under the Fourteenth Amendment); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (holding that verbal threats do not violate the Fourteenth Amendment "unless accompanied by physical force or the present ability to effectuate the threat"); *Shabazz*, 994 F. Supp. at 474 (holding that "verbal harassment or profanity alone, 'unaccompanied by any injury no matter how inappropriate, unprofessional or reprehensible it might seem,' does not violate any federally protected right and therefore is not actionable under 42 U.S.C. § 1983.");

64

*Harris*, 957 F. Supp. at 475 ("[A]lthough indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983.  Furthermore, verbal threats do not violate the fourteenth amendment 'unless accompanied by physical force or the present ability to effectuate the threat.'" (internal citations omitted) (quoting *Jermosen v. Coughlin*, 878 F. Supp. 444, 449 (N.D.N.Y. 1995)).  Accordingly, plaintiff's claims against Weidel must be dismissed.[44]

We also notice that plaintiff, for the first time, alleges in her affidavit and Rule 56.1 Statement that "Weidel had threatened to arrest me other times as well, including in July 1998, when he told me over the telephone that he would arrest me if I didn't surrender my son." (*See* Pl. Aff. ¶ 25; Pl. Rule 56.1 Stmt. ¶ 25.)  Plaintiff, however, provides absolutely no evidence that this occurred, nor any evidence regarding the circumstances surrounding this alleged threat.  In fact, plaintiff filed a complaint with the Ramapo Police Department regarding a visitation dispute that very day and made no mention of Weidel but mentioned several other officers by name. (*See* Pl. Aff., Ex. 21).  Plaintiff also states that Weidel was in some way involved in a visitation dispute in January 1999 and that he initiated criminal charges against her in connection therewith. (*See* Pl. Aff. ¶ 24; Pl. Rule 56.1 Stmt. ¶ 24.)  Although the record shows that Weidel witnessed a criminal complaint filed by Peikon in connection with an incident that occurred on January 23, 1999 – that

---

[44] Plaintiff also appears to claim that the Ramapo Police Department violated her constitutional rights when they sent officers to take Weidel's statement after this confrontation prior to sending  someone to plaintiff's residence when, in fact, plaintiff called the police first.  Plaintiff emphasizes that this constituted a violation of the Ramapo Police Department's policy.  Even if this does in fact constitute a violation of internal policy, it does not give rise to a cognizable claim pursuant to § 1983.  *See United States v. Caceres*, 440 U.S. 741, 749-57 (1979) (holding that IRS's violation of its internal policies does not give rise to actionable claims pursuant to § 1983 unless an independent constitutional claim is shown).

65

is, he took Peikon's statement – (*see* Pl. Aff., Ex. 42), there is absolutely no evidence that Weidel was involved with the police's handling of that dispute.  In any event, plaintiff's eleventh hour allegations in no way constitute cognizable claims pursuant to § 1983.  And even if they did, plaintiff failed to plead either one in her Complaint or Amended Complaint, and, in the present case, considering them now for the first time on summary judgment would be prejudicial to defendants. *See, e.g.*, *Mauro v. S. New England Telecomm., Inc.*, 208 F.3d 384, 386 n.1 (2d Cir. 2000) (affirming district court's decision not to consider claim raised for the first time on a motion for summary judgment).  Accordingly, all of plaintiff's claims against Weidel must be dismissed.[45]

## SUMMARY

There undoubtedly are cases in which individual police officers or even entire police departments, infuriated by the defiant and provocative behavior of a local resident, retaliate by abusing their authority to make life unpleasant for that resident.  However our meticulous sifting through the unjustifiably voluminous record of pre-trial discovery in the present action leaves us with the firm conviction that it is not one of such cases.

We have no doubt that plaintiff sincerely believes that her outspoken partisan advocacy on local political issues, including those involving police protection, has made her a target of persecution by police officers and election officials.  It is also clear that she has had an inordinate number of abrasive contacts with such authorities.  But we strongly believe that, on the facts

---

[45] Notably, plaintiff alleges other incidents in her affidavit that the Court never allowed plaintiff to incorporate into her pleadings by amendment and we therefore have not considered them.  Such allegations regard separate and distinct incidents that could very well form the basis of an entirely separate lawsuit, notwithstanding this Court's decision in the present matter.

established by the record we have examined, no reasonable jury could find that either the police or the election officials deprived plaintiff of any of her constitutional rights, although at times plaintiff's combative assertion of those rights might well have provoked such retaliation.

Even if most of the claims asserted by plaintiff were not barred by the applicable statute of limitations, her attempt to make a "federal case" out of her perennial feud with local authorities would not merit the further attention of this Court or the time of a jury of her peers.

## CONCLUSION

For the reasons stated above, the motions for summary judgment filed by the Village of Montebello, Debra Mastroeni, Santos Luciano, the Town of Ramapo, Leslie Lampert and Bradley Weidel are granted and the Clerk's Office is directed to enter judgment, dismissing the Complaint in its entirety, with prejudice and without costs or attorneys' fees.

SO ORDERED.

Dated: White Plains, NY
       February 23, 2007

_____
Senior United States District Judge

67